Basis Technology Corporation *vs.* Amazon.com, Inc.

No. 06-P-1048.

Suffolk. March 16, 2007. - January 7, 2008.

Present: Lenk, Green, & Sikora, JJ.

*Contract,* Settlement agreement, What constitutes, Construction of contract. *Judicial Estoppel.*

A Superior Court judge hearing a motion to enforce a midtrial settlement agreement correctly ruled that settlement terms set forth in an exchange of electronic mail messages between counsel created a complete and unambiguous agreement as a matter of law, where the messages demonstrated that the parties had resolved the essential business terms of the settlement, despite references in the messages to further writings and action [32-38], and where no critical indefiniteness existed in a stock conversion term set forth in the messages, given that the term furnished an objective method for determination of a variable contractual element [38-39]; for similar reasons, the judge correctly found that the parties had the contemporaneous intention to be bound by the settlement agreement [39-40], a finding that was not disturbed either by the plaintiff's later proposal of two additional, independent terms [40-41] or by the defendant's post hoc attempts to renounce its genuine original intent to settle [41], but was, rather, amply supported by the parties' report of settlement to the trial court, in reliance on which the judge had ended the trial [41-45].

Civil action commenced in the Superior Court Department on May 13, 2003.

A motion to enforce a settlement agreement was heard by *Nonnie S. Burnes,* J.

*Anthony M. Feeherry* (*Alisha R. Bloom* with him) for the defendant.

*James F. Kavanaugh, Jr.* (*Thomas J. Gallitano* with him) for the plaintiff.

Sikora, J. The issue of this appeal is the enforceability of a disputed midtrial settlement agreement. After three days of evidence in a jury-waived trial in the Superior Court, the plaintiff,

Basis Technology Corporation (Basis), and the defendant, Amazon. com, Inc. (Amazon), appeared to agree upon settlement terms by an exchange of electronic mail messages (e-mails) between counsel. On the morning of the fourth day they reported the apparent settlement orally and on the record to the trial judge. Trial ceased. The court entered an order of dismissal nisi. The order directed the parties to file an agreement for judgment or stipulation of dismissal within thirty days. Then they encountered disagreement, engaged in communications, received an extension, and reached an impasse. Basis moved to enforce the settlement agreement; Amazon opposed. By affidavit and exhibit material the parties submitted to the trial judge their e-mail exchange and much of their recorded nisi period communications. After hearing, the trial judge ruled the e-mail settlement terms to be a valid and binding agreement. She entered judgment in favor of Basis for specific enforcement of the settlement terms. The judge deleted one term and made minor changes to others. Amazon has appealed.

*Background.* 1. *The parties' business relationship.* The procedural history and the following facts emerge from the record and from the parties' briefs as undisputed. Basis creates software and provides related technical services for its use. Amazon sells books and other products through computerized marketing. Both companies are incorporated in the State of Delaware. The public document recording incorporation there is entitled the "Certificate of Incorporation."

In September of 1999, the companies entered into a "Services Agreement." Under its terms Basis was to render technical services enabling Amazon to create an electronic commerce system in Japan for the sale of books and other products. Amazon thereafter introduced a Japanese language Web site to serve Japan and Japanese-speaking consumers everywhere. The services agreement identified certain "business consulting" services (such as research and the composition of a business plan; establishment of a headquarters and distribution and customer service centers in Japan; the identification of local legal and taxation requirements; and the creation of a Japanese verification database) as "out-of-scope" services to be covered by separately negotiated contracts.

In addition, on December 29, 1999, Basis and Amazon entered

into a "Series A Preferred Stock Purchase Agreement" (1999 stock purchase agreement). Under its terms Amazon purchased 1,654,412 shares of Basis Series A preferred stock for the price of $2.72 per share and acquired a seat on Basis's board of directors. Under the 1999 stock purchase agreement, Amazon acquired also the right to convert its preferred stock into common stock by use of a conversion ratio of one-to-one.

The 1999 stock purchase agreement provided Amazon with certain antidilution rights, set out in detail in Basis's certificate of incorporation. The antidilution provision would activate if Basis were to issue new common or preferred stock without consideration or for a price below the amount paid by Amazon. Amazon had the right to recalculate the conversion ratio according to a fixed formula factoring into account the price Amazon had initially paid for the preferred stock (or the last price Amazon had paid for preferred stock), the price paid for the newly issued stock shares, and the number of shares outstanding prior to and subsequent to the issuance of the new shares. This adaptive formula operated to maintain the original percentage of Amazon's ownership of Series A preferred shares.[1]

In April of 2001, Amazon consented to an amendment to Basis's certificate of incorporation. The amendment enabled a recapitalization of Basis. It revised Amazon's "conversion price" to $1.36 per share of Series A preferred stock and thereby made its conversion ratio two-to-one (i.e., two common shares for every one share of Series A preferred stock). The amendment retained the antidilution formula for adjustment of the conversion ratio in the event of an issuance of stock at a price below Amazon's conversion price.

In March of 2004, Basis undertook a further amendment of its certificate of incorporation by issuance of 466,827 shares of Series B preferred stock to a company known as In-Q-Tel at a stated price of $1.39 per share. The 2004 amendment left unchanged the antidilution formula. The issuance of the Series B stock to In-Q-Tel accompanied the contractual licensing of Basis software to In-Q-Tel as a customer. The parties describe

---

[1]The antidilution formula operated by means of a complex fraction. Its precise mechanics are not material to decision of the appeal.

In-Q-Tel as the venture capital arm of the Central Intelligence Agency.

On March 8, 2004, the corporate secretary of Basis distributed to all preferred shareholders a memorandum describing the terms of the issuance to In-Q-Tel. The memorandum included copies of the enabling vote of the board of directors and of the proposed conforming amendments to the certificate of incorporation. It is undisputed that Amazon received notice of the March, 2004, amendment, but did not give its consent.[2]

2. *Litigation and report of settlement.* Meanwhile, in May of 2003, Basis began the underlying action against Amazon in the Superior Court upon claims of breach of fiduciary duty, quantum meruit, and G. L. c. 93A violations for nonpayment for "out of scope" work. The case advanced through discovery to a jury-waived trial beginning on March 21, 2005.

On the evening of March 23, after the third day of evidence and after settlement discussions, Basis counsel sent an e-mail with the following text to Amazon counsel:[3]

> "From:    [Basis counsel]
> Sent:      Wednesday, March 23, 2005 10:37 PM
> To:         [Amazon counsel]
> Cc:         [ ]
> Subject:  Basis v. Amazon — Settlement Terms
>
> "[Amazon counsel] — This e-mail confirms the essential business terms of the settlement between our respective clients . . . . Basis and Amazon agree that they promptly will take all reasonable steps to memorialize in a written agreement, to be signed by individuals authorized by each party, the terms set forth below, as well as such other terms that are reasonably necessary to make these terms effective.

---

[2]The parties disagree whether Amazon's consent was required, but the trial judge found consent to be immaterial to the validity of the settlement presently on appeal, because Amazon "could have asked or checked to see if its rights had been harmed [by the In-Q-Tel transaction] before it made the deal [to settle] with Basis. Anyone may forgive an illegal act in settling a law suit."

[3]The judge amended the e-mail terms by making certain deletions, which appear in italics. The final judgment ordered the parties to comply with the settlement terms, as amended.

"Those terms are as follows:

"1. Amazon shall pay to Basis, *within a period of days after execution of a settlement agreement,* the sum of $275,000 (U.S.).

"2. Amazon shall exercise its conversion rights, and in so doing shall convert all Basis Series A Preferred Shares to Common Shares, pursuant to the terms and conditions set forth in the Series A Preferred Stock Purchase Agreement dated as of December 29, 1999.

"3. Amazon shall relinquish all rights held as a holder of Preferred Shares, including but not limited to the right to designate a member of the Basis Board of Directors.

"4. Basis shall be permitted to resume use of the Amazon name and logo on its website and in its printed marketing material, in the manner and degree in which Basis has been making such use up until recently taking steps to remove references to Amazon from the Basis website *(the agreement will spell this out to everyone's satisfaction).*

"5. *Amazon agrees that* Basis shall be removed from any and all 'do not use' lists or 'blacklists,' again on terms and conditions to be spelled out in more detail in the settlement agreement.

*"6. Amazon and Basis will exchange comprehensive releases, which will include all claims that were brought, or that could have been brought, or that have been threatened to be brought, by either party against the other. Once again, the settlement agreement will provide further clarity on this point.*

"[Amazon counsel], please contact me first thing tomorrow morning if this e-mail does not accurately summarize the settlement terms reached earlier this evening.

"See you tomorrow morning when we report this matter settled to the Court."

At 7:26 A.M. on March 24, Amazon counsel sent an e-mail with a one-word reply: "correct." Later in the morning, in open

court and on the record, both counsel reported the result of a settlement without specification of the terms. The judge ended the trial and entered the nisi order.

3. *Posttrial communications.* On March 25, Amazon's counsel sent a facsimile of the first draft of a settlement agreement to Basis's counsel. The draft comported with all the terms of the e-mail exchange, and added some implementing and boilerplate terms (renunciation of any admission of wrongdoing or liability; confidentiality for the terms; confirmation of the authority of the persons executing the settlement agreement to bind the parties; severability; modification by writing only; and willingness to execute any additional documents necessary for implementation).

On March 28 and 29, respectively, Basis counsel returned proposed revised drafts. They contained the original e-mail terms, the implementing terms, and two additional proposals: that Amazon provide written consent to the March, 2004, stock issuance to In-Q-Tel; and that Amazon consent to an upcoming further issuance of stock to In-Q-Tel in 2005. On March 31, Amazon expressed an interest in deleting the second paragraph of the original e-mail proposal, which called for Amazon to convert its Series A preferred shares to common shares. On that same day, Basis counsel sent an e-mail to Amazon counsel, stating, inter alia, that the stock conversion term "must remain a feature of the deal, for the reasons you and I have discussed." Amazon counsel then replied, "[W]hat would it take to forego [*sic*] conversion e.g., more $$ outright?? [A] bigger coupon?[] [S]ince I am anxious that we may lose endorsement etc. if conversion is still necessary . . . this movement at Amazon started when I raised the idea [of a meeting between executives] to clear the air [for more positive business relations between the companies]."

On April 4, Amazon counsel asked about the terms of In-Q-Tel's prospective purchase of Basis stock. On the same day, Basis counsel provided the terms of that expected transaction. He added that the contemplated issuance of stock to In-Q-Tel would have no effect on the settlement agreement. Rather, Amazon's conversion of its Series A preferred shares to common shares, required by the settlement agreement, would continue to be governed by the "Amended and Restated Certificate of

Incorporation." On April 12, both counsel sought and received an extension of the nisi period from the trial judge. Subsequently, Basis counsel by e-mail and a memorandum explained the reasoning supporting Basis's conclusion that the antidilution formula produced a ratio of two shares of common stock for each share of Amazon's preferred stock. Amazon contended that the 2004 issuance of stock to In-Q-Tel required a ratio of more than 2.1-to-one; and that the differential would deprive Amazon of 164,544 common shares at a value of approximately $228,000 and would reduce Amazon's desired ownership stake in Basis from approximately ten percent to approximately 8.5 percent.

The parties were deadlocked. On April 21, Basis served its motion to enforce the settlement agreement. Amazon opposed. Each side supported its position with extensive affidavits, written and oral argument, and verified copies of the posttrial settlement communications and of the e-mail exchange of March 23 and 24. The motion and opposition presented the issues whether the e-mail terms were sufficiently complete and definite to form an agreement and whether Amazon had intended to be bound by them.

4. *The trial judge's decision.* After hearing and examination of all materials, the judge[4] ruled that the e-mail exchange constituted "an agreement on all material terms" and that "there [was] nothing ambiguous about this agreement." She found that Amazon's claimed unawareness of an alleged dilution of its ownership share by means of the 2004 issuance of stock to In-Q-Tel was a "post hoc objection" unworthy of belief because of the availability of the conversion formula and the data describing the 2004 transactions at all times leading up to the settlement. She entered judgment specifically enforcing the first five numbered e-mail terms. She deleted the requirement of the sixth and final term for the exchange of comprehensive releases, and made other minor deletions.

*Discussion.* Amazon appeals upon two grounds: (1) that the judge, as a matter of law, incorrectly ruled that the e-mail exchange created a complete and unambiguous agreement; and (2) that the judge, as a matter of fact finding, incorrectly

---

[4]The same judge presided over the trial and over the posttrial motion for enforcement of the settlement.

determined that Amazon had intended to be bound by the e-mail terms at the time of their exchange.

1. *Standards of review.* The interpretation of an unambiguous contract is a question of law. See *Lewis* v. *Commonwealth,* 332 Mass. 4, 6 (1954); *Robert Indus., Inc.* v. *Spence,* 362 Mass. 751, 755 (1973); *Seaco Ins. Co.* v. *Barbosa,* 435 Mass. 772, 779 (2002). The preliminary question of the existence of an ambiguity in an agreement is a question of law also. See *Berkowitz* v. *President & Fellows of Harvard College,* 58 Mass. App. Ct. 262, 270 (2003); *Diamond Crystal Brands, Inc.* v. *Backleaf, LLC,* 60 Mass. App. Ct. 502, 504-505 (2004); *Quinn* v. *Mar-Lees Seafood, LLC,* 69 Mass. App. Ct. 688, 695 (2007). Consequently, we examine de novo the determination of the e-mail terms as a sufficiently clear and complete agreement.

The factual finding of Amazon's contemporaneous intent to be bound by the e-mail terms receives review under the "clearly erroneous" standard of Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996).[5] "A finding is 'clearly erroneous' only when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 509 (1997), quoting from *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 160 (1977).

2. *Interpretation of the e-mail communication as a matter of law.* We examine the text of the terms for the incompleteness and indefiniteness charged by Amazon. Provisions are not ambiguous simply because the parties have developed different interpretations of them. See *Suffolk Constr. Co.* v. *Lanco Scaffolding Co.,* 47 Mass. App. Ct. 726, 729 (1999); *Quinn* v. *Mar-Lees Seafood, LLC,* 69 Mass. App. Ct. at 695. Genuine ambiguity requires language "susceptible of more than one meaning [so that] reasonably intelligent persons would differ as to which

---

[5]In its original brief Amazon characterizes the enforcement decision of the trial judge entirely as a ruling of law. In its reply brief Amazon acknowledges the question of intent as a factual issue governed on appeal by the standard of clear error. Since both parties have argued for review of the judge's factual findings under the "clearly erroneous" test of rule 52(a), we apply that standard.

meaning is the proper one." *Ibid.*, quoting from *Citation Ins. Co.* v. *Gomez*, 426 Mass. 379, 381 (1998).

a. *The references to further writings and action.* As indication of incompleteness, Amazon points to references in the March 23 e-mail (i) that the parties "will take all reasonable steps to memorialize [the terms] in a written agreement"; (ii) that duly authorized individuals will sign the subsequent writing; (iii) that details of the removal of Basis from any Amazon "blacklist" will appear in the settlement agreement; and (iv) that the settlement agreement will provide further clarity as to the matter of mutual comprehensive releases.

We must interpret the document as a whole. *Glick* v. *Greenleaf*, 383 Mass. 290, 296 (1981). *Wood* v. *Roy Lapidus, Inc.*, 10 Mass. App. Ct. 761, 764 (1980). In the preface to the enumerated terms, Basis counsel stated that the "e-mail confirms the essential business terms of the settlement between our respective clients," and that the parties "agree that they promptly will take all reasonable steps to memorialize" those terms. Amazon counsel concisely responded, "correct." Thus the "essential business terms" were resolved. The parties were proceeding to "memorialize" or record the settlement terms, not to create them. The term removing Basis from any Amazon "blacklist" was categorical, but not vague. The provision for mutual releases contemplated "all claims that were brought, or that could have been brought, or that have been threatened to be brought, by either party against the other." It resembled the typical general release used by experienced counsel to resolve litigation (especially between parties preserving the opportunity for a further business relationship). Little need remained for "further clarity." In reaction to the invitation to raise any inaccuracies before the court appearance of the next morning, Amazon counsel identified no omissions or variances. Nor did Amazon hypothesize to the trial judge any plausible material omissions. In short, our textual analysis of the claim of incompleteness and ambiguity places the case well within the radius of *Goren* v. *Royal Invs., Inc.*, 25 Mass. App. Ct. 137, 140 (1987) ("If . . . the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract"). See *Novel Iron*

*Works, Inc.* v. *Wexler Constr. Co.,* 26 Mass. App. Ct. 401, 407-410 (1988); Restatement (Second) of Contracts § 27 (1981).

b. *The alleged indefiniteness of the stock conversion term as a matter of law.* Amazon's most emphatic contention is that the second numbered paragraph of the March 23 e-mail, requiring Amazon to convert its Series A preferred shares to common shares "pursuant to the terms and conditions set forth in the Series A Preferred Stock Purchase Agreement dated as of December 29, 1999," is fatally indefinite. The parties agree that they understood the reference to the 1999 stock purchase agreement to include the 2001 amendment revising the conversion ratio of common to preferred stock from one-to-one to two-to-one. However, Amazon insists that it could not know the precise conversion ratio at the time of the e-mail exchange on March 23 and 24, 2005, because the stock issuance to In-Q-Tel in March of 2004 had inflicted a still unquantified dilution of the value of Amazon's convertible preferred shares and of its resulting common shares.

Amazon does not dispute that it had received notice of the terms of the In-Q-Tel issuance (466,827 shares of Basis Series B preferred stock at the price of $1.39 per share) in March of 2004 by memorandum from Basis's corporate secretary; and that it had conducted pretrial discovery of that issuance in this litigation. However, Amazon maintains that Basis had never provided an objective valuation substantiating the price of $1.39 per share as fair market value and as the actual price paid by In-Q-Tel. (Amazon suspected Basis of providing In-Q-Tel a favorable below-market price as part of the over-all transaction establishing In-Q-Tel as a Basis software licensee and preferred customer.)

This argument does not establish a critical indefiniteness in the second paragraph of the March e-mail, the stock conversion term. The term incorporates by reference the ratio set forth in the 1999 stock purchase agreement and the agreed 2001 amendment to Basis's certificate of incorporation. Those provisions, in turn, incorporate the conversion ratio and the accompanying adaptive antidilution formula as constant elements of the Basis certificate of incorporation. Together they furnished an objective method for determination of a variable contractual element.

Compare *Meehan* v. *Shaughnessy*, 404 Mass. 419, 445 n.22 (1989) (professional norms can supply meaningful definition to the term "fair charge" in a law firm partnership agreement; they furnished an objective standard beyond the partisan desires of the contracting parties); *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 518 (1998), cert. denied, 525 U.S. 1177 (1999) (a formula to determine the purchase price for a downtown development parcel by criteria of subsequent appraisal and of increased value attributable to the project itself created a sufficiently definite term in a setting of inevitable uncertainties). "If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding." *Ibid.* Amazon had actual or chargeable knowledge of the antidilution conversion formula and its ingredient data when it agreed to the stock conversion settlement term. Amazon's objection is that it distrusted the data. As the trial judge observed, however, Amazon could have and should have investigated the data to its satisfaction before its agreement to end the trial. If Amazon had remained genuinely suspicious, it could have declined that settlement term or the settlement altogether. The e-mail term promised the use of the conversion process, and not any specific resulting ratio or ownership share. Amazon accepted that process. As a matter of law, the stock conversion term is sufficiently definite for enforcement.

3. *The intention to be bound as an issue of fact.* To create an enforceable contract, the parties must have had the intention to be bound by their agreement at the moment of its formation. See *McCarthy* v. *Tobin*, 429 Mass. 84, 87 (1999) (intention to be bound is the "controlling fact"); *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000); *Hunneman Real Estate Corp.* v. *Norwood Realty, Inc.*, 54 Mass. App. Ct. 416, 419-421 (2002). Amazon maintains that the trial judge's findings of such an intent on its part on March 23 and 24, 2005, and of its later repudiation as an afterthought are clearly erroneous.

a. *Further writings.* As one ground for its argument that it did not intend to be bound, Amazon again relies upon the e-mail references to execution of later documents as an indicator of the

postponement of a firm intention. Some authority does support the evidentiary point that the deferral of a final written document may weaken the claim of a present and binding intent of the negotiating parties. See especially *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216-217 (1935) (a contract to create a commercial tenancy failed to materialize for lack of both present intent and important terms). The court in *Rosenfield* added that a deferred document was not conclusive of a deferred intent; a present agreement upon all material terms could reduce the later document to mere memorialization of an existent agreement. *Id.* at 216. *Rosenfield* remains a leading discussion of the present issue. In *Goren* v. *Royal Invs., Inc.*, 25 Mass. App. Ct. at 140-141, with reliance upon *Rosenfield's* analysis, this court found the situation to be one of a present agreement awaiting a later document. For the reasons itemized above, this case belongs to the same category. As a matter of fact the March 23 e-mail references to later memorialization, authorized signatories, detailed removal from Amazon's "blacklist," and further "clarity" in the final releases do not negate the present intention evident in the main terms and their unqualified acceptance (devoid of additions, subtractions, and modifications) by Amazon counsel.

b. *The conversion ratio.* Amazon invokes the alleged indefiniteness of the stock conversion ratio as evidence undermining the findings of present intent. For the reasons already canvassed, as a matter of fact and as a matter of law, the conversion ratio (including its component antidilution formula) did not suffer from indefiniteness negating the present intent by Amazon to accept the numbers resulting from application of the conversion formula.[6]

c. *Post e-mail proposals by Basis.* In the course of communication in the days after the March 24 report of settlement

---

[6]See especially *Carver* v. *Waldman*, 21 Mass. App. Ct. 958, 959 (1986), in which a party attempting to rescind a settlement agreement claimed that "a feature of the agreement was predicated on a mutual belief as to the value of corporate securities to be used to adjust interests," but failed to "support with evidence either the existence of the predicate, or the materiality or injustice of the alleged deviation from it." Similarly, here, Amazon is asserting an expected particular value from the conversion formula as a predicate of the settlement agreement. The evidence shows only that the parties agreed upon the formula, not a specifically resulting value.

to the court, Basis counsel proposed (1) that Amazon retroactively give the consent which it had withheld from the March, 2004, stock issuance to In-Q-Tel (even though Basis maintained that it had meanwhile received consent from the required percentage of shareholders); and (2) that Amazon give prospective consent to an expected further issuance of stock to In-Q-Tel during 2005. The first proposal occurred by e-mail on March 25, and the second on March 29. Amazon views these communications as evidence of the incomplete and nonbinding character of the March 23 e-mail terms. However, at no time did Basis condition its adherence to the original six numbered terms upon Amazon's acceptance of the two additional proposals. As Amazon resisted them, Basis's counsel consistently pressed for a final document embodying the six original settlement provisions. The original agreement remained independent of additional discussion. The critical point remained the intentions of the parties to be bound by the existing e-mail terms on March 23 and 24.

d. *Amazon's change of mind.* The judge explicitly found Amazon's complaints about the conversion process and the 2004 issuance of stock to In-Q-Tel to be "post hoc" objections "probably from the senior executives at Amazon to whom this agreement eventually arrived." Verified copies of posttrial communications supported that inference. In particular, the communiqué of March 31 from Amazon counsel asked, for the first time and seven days after the settlement report to the court, whether Amazon could "forego [*sic*] conversion" in exchange for a larger cash payment or "bigger coupon." The same message acknowledged that "this movement at Amazon" had started during the week after the cessation of the trial. This evidence permitted the judge to find that Amazon was attempting to renounce its genuine original intent and was seeking an escape hatch from the stock conversion term in the settlement agreement.

e. *The report of settlement to the court.* "To ascertain intent, a court considers the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances." *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 45-46 (1991). The essential circumstance of this disputed agreement is that it concluded a trial. In the course of its original and reply briefs, Amazon characterizes the e-mail exchange as a

"framework" causing the "suspen[sion]" of the trial and forming a "starting point" toward a "final settlement."

This vocabulary discloses a fundamental misconception. As the trial judge explained in her memorandum of decision, she "terminated" the trial; she did not suspend it for exploratory negotiations. She did so in reliance upon the parties' report of an accomplished agreement for the settlement of their dispute. This court's decisions have consistently emphasized the qualities of seriousness and commitment characterizing a settlement agreement reported to a trial court. See *Correia* v. *DeSimone*, 34 Mass. App. Ct. 601, 603-604 (1993) ("[b]y reporting to the court that the case was settled, the defendants signalled that they had gone beyond deciding whether to give up the right to trial in exchange for the plaintiffs' offer; . . . the integrity of the judicial process . . . would be ill served if those intimately involved in that process, litigants, attorneys, and judges, could not rely on declarations of settlement made to the court"). See also *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85, 86-89 (1984) (once the parties indicated to the judge that they had entered into a settlement agreement with the express intention of reducing the agreement to writing, the agreement became binding even in the absence of a formal signed agreement); *Carver* v. *Waldman*, 21 Mass. App. Ct. 958, 960 (1986) ("where a settlement, agreed to by parties represented by counsel, is offered to a judge to be embodied in a judgment, and it appears desirable that the settlement be given the force of a judgment, the judge may act without assuming responsibility for the fairness of the terms"); *Hubbard* v. *Peairs*, 24 Mass. App. Ct. 372, 374, 377 (1987) (parties disclosed in open court that they had reached a settlement; court concluded that "the [subsequent] writing would serve only as a memorial of an already binding agreement"); *Innis* v. *Innis*, 35 Mass. App. Ct. 115, 118 (1993) ("[c]ounsel was not at liberty to let the judgment enter with [the client's] apparent approval and later invite a battle of affidavits about why the judgment should not have entered").

The case of *Correia* v. *DeSimone*, *supra*, shares strong common features with this appeal. In that instance, after the empanelment of the jury, counsel for the parties reported settlement to the trial judge. On the following morning, the defendants

"reported to the judge that they had changed their minds and were now unwilling to settle on the offered terms." 34 Mass. App. Ct. at 602. After unsuccessful mediation, the judge declared a mistrial and discharged the jury. The plaintiffs successfully moved for summary judgment specifically enforcing the terms of the oral settlement agreement. The defendants argued that the settlement offer had lacked definiteness. *Id.* at 601-603. On appeal this court affirmed the enforcement of the settlement upon the ground of judicial estoppel even as the court acknowledged the uncertain status of that doctrine in Massachusetts as of 1993. We reasoned that the important reliability of reported settlement agreements required its application. *Id.* at 603-605. Since 1993, judicial estoppel has achieved explicit recognition in the Commonwealth.[7] Neither party has expressly raised it here. We believe that its purpose of consistent, trustworthy, and efficient adjudication supports affirmance of this settlement agreement.

The intentions underlying a settlement report typically result from several realizations. First, at the brink of trial the parties and their counsel have progressed through an extensive process of pleading, discovery, motion practice, and preliminary conferences. That agenda will have informed them of the strengths and weaknesses of their positions and of the wisdom of a compromise. The education of that process should produce prudent and firm settlement decisions.

Second, the immediacy of the consequences of a settlement report usually concentrates the minds of clients and counsel. The report means that trial either will not begin or will suddenly end. No postponement of the dispute remains. Each side is surrendering promptly its right to litigate any further toward its ultimate objective. The elimination of the trial amounts to partial performance of the agreement. It presumably comes from careful reflection and contemporaneous acceptance of an agreement.

---

[7]Under the principle of judicial estoppel a party may not successfully maintain a position in one court and thereafter repudiate or contradict that position in the same proceeding or in separate proceedings in that or other courts. See *Paixao* v. *Paixao*, 429 Mass. 307, 308-311 (1999); *Otis* v. *Arbella Mut. Ins. Co.*, 443 Mass. 634, 639-642 (2005). See also *Chiao-Yun Ku* v. *Framingham*, 53 Mass. App. Ct. 727, 729 (2002); *Commonwealth* v. *Gardner*, 67 Mass. App. Ct. 744, 747-748 & n.5 (2006).

Third, and perhaps most importantly, litigants and litigators negotiating settlement on the eve of trial or in the course of trial are dealing not only with their own interests but also with the institutional reliance of the trial court. The court will have invested its preparation and work in the trial. That effort embodies valuable and finite public resources.[8] A settlement during the progress of a trial effectively sets aside that work. Ideally the work will have promoted a rational solution between the parties. It should not go to waste by reason of repudiated settlement agreements.

Trial counsel reporting a settlement agreement are not taking out an option to settle.[9] They are not free to cause the court to repeat the considerable preparation and work already consumed by their original trial. Nor should the parties squander the time, effort, expense, and tribulation of their own work by way of an unreliable settlement.

In sum, the deliberateness and the gravity attributable to a report of a settlement, especially during the progress of a trial, weigh heavily as circumstantial evidence of the intention of a party such as Amazon to be bound by its communication to the opposing party and to the court.

For all these reasons the evidence amply supports the judge's

---

[8]Those resources will include the work of the judge, the session clerk, a judicial clerk, a court reporter, court officers, and the preparation and attendance of witnesses local and distant. The court's reliance will extend to the scheduling of oncoming trials and their many participants. This instance was a bench trial. Naturally a jury trial would expand the public investment by numerous citizen-days of attendance and attention. These logistics of the trial courts show that knowledgeable litigators cannot reasonably intend judges to "suspend" trials while they discuss "frameworks" for settlement.

[9]See *Points East, Inc.* v. *City Council of Gloucester,* 15 Mass. App. Ct. 722, 726 (1983), in which this court made the same observation about equivocal use of the appellate process.

Upon notice of a settlement, as here, the Massachusetts trial court typically enters an order of "dismissal nisi." "Nisi" in its root Latin sense means "unless." Literally the court is determining that the litigation has ended "unless" the parties inform it within the specified nisi period of a failure of implementation of the settlement. That failure must usually result from a problem or obstacle beyond the control of the parties. Uncontrollable causes may trigger the conditional "nisi" character of the dismissal order and entitle the parties to return to litigation. Most importantly, the "nisi" order does not mean that dismissal shall enter "unless" a party changes its mind about settlement.

finding that Amazon intended to be bound by the terms of the March 23 e-mail.[10]

*Conclusion.* The judge correctly ruled that the March 23 e-mail constituted a sufficiently complete and unambiguous statement as a matter of law, and that both parties intended to be bound by that communication of settlement terms.

*Judgment affirmed.*

---

[10]Amazon argues that the judge's deletion of the sixth and final e-mail provision for comprehensive mutual releases acknowledges the incomplete and nonbinding character of the e-mail agreement. The judge did not elaborate upon this modification in the declaratory final judgment. The tenor of her memorandum of decision leaves no doubt that the remaining terms and the waiver of the trial are binding.

We leave in place the judge's deletions. Neither party has noticed an appeal from that element of the final judgment pursuant to Mass.R.A.P. 3(a), as amended, 378 Mass. 927 (1979), or presented any argument upon it by brief pursuant to Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Consequently, we have no issue and no enlightening argument upon an issue requiring decision. The first five terms remain to form a full and effective resolution of the claims of this lawsuit.