Greco, P.J.
This dispute between a former lessor and its lessees comes before us by a rather circuitous procedural route. It would appear that the lessees, Liv R. Zoe, LLC, Anthony A. Karpouzis, Kellie L. Karpouzis, and Andrew D. Karpouzis (collectively, “Zoe”), filed an action for a declaratory judgment. The problem, however, is that the District Court lacks the authority to give such relief. G.L.C. 231A, §1. Although no ruling to that effect was made, the case was treated as a contractual dispute between Zoe and its former lessors, Stuart M. Rose and Charles E. Morneau, Trustees of 153 Turnpike Road Nominee Trust U/D/T Dated August 20, 1993 (‘Trustees”). Both parties then filed Mass. R. Civ. R, Rule 56, motions for summary judgment. Zoe’s motion was denied. The Trustees’ motion was allowed. In her decision, the motion judge set out what she determined were the “undisputed facts,” based upon which judgment was entered for the Trustees on November 2, 2011 in the amount of $24,174.62. This amount included rent due, prejudgment interest, various other costs, and “atty. fees and costs for termination and negotiation of a new lease.” Zoe did not appeal the order for summary judgment. However, on November 14, 2011, the Trustees filed a motion to amend the judgment asking that the damages award also include damages for late fees as well as additional attorney’s fees for services performed related to its motion to amend.[4] The trial judge denied the Trustees’ motion to amend without making any findings. This appeal followed.
The judge found that the following facts were undisputed. On August 27, 2007, Zoe assumed the obligations and liabilities under a lease that JR Harrington *188 Westboro Inc. had with the Trustees. That lease was scheduled to terminate on November 30, 2010. The three individuals associated with Zoe signed on as guarantors of its obligations under the lease. In September of 2009, Zoe informed the Trustees that it did not intend to renew the lease in November of 2010. A month after so informing the Trustees, Zoe vacated the premises. The Trustees responded by notifying Zoe that it was in default and that if Zoe did not “cure” the default within thirty days, the lease would terminate. On December 1,2009, Zoe sent a letter to the Trustees acknowledging that the premises had been vacated and requesting that the Trustees apply its security deposit to the December rent. Zoe also enclosed a check for the remainder of the December rent. Shortly thereafter, on December 7th, the parties, by way of a letter between their attorneys, reached an agreement whereby, “with full reservation of all rights each party may have against the other in connection with the lease" (emphasis supplied), it was agreed that Zoe waived any right to cure its default, that the lease terminated on that day, and that the Trustees may take “full possession of the premises.” The letter indicated that Zoe entered into this agreement “in an effort to cooperate with [the Trustees] in their attempt to re-let the Premises and mitigate whatever damages [the Trustees] may have suffered or will suffer as a result of the... default and termination of the lease.”
On December 18,2009, the Trustees entered into an arrangement with a prospective tenant, Bikram Yoga. It was agreed between these two parties that Bikram Yoga’s lease would begin when Bikram Yoga obtained a building permit from the town of Westborough to construct the “build out” at the premises. Under Article III of that lease, it was provided that until the permit was obtained, Bikram Yoga owed an unspecified “Minimum Rent.” The actual rent would commence within sixty days, or the opening of Bikram Yoga’s business, whichever came first. Bikram Yoga began paying rent as of March, 2010.[5]
The provisions of the lease assumed by Zoe relevant to the issues on appeal are Article XIX, Sec. 1(a) and Article III, Sec. 4. Under the former, in the event of a default, the lessee was obligated to pay “any expenses incurred by [the] Lessor as a consequence of such default... including but not limited to, attorneys’ fees, brokers’ fees and expenses of repairing, altering and putting the ... Premises in good order and condition and preparing the same for reletting.” Under Article III, Sec. 4, “[a]ny payment of minimum rent, additional rent or other sums due under this Lease received by the Lessor more than five (5) days after its due date shall be subject to [a] Late Charge [of $25 per day],[6] accruing from the due date of such payment to the date of actual receipt of such payment by Lessor.”
Based upon the above documents, the trial judge ruled that Zoe was liable for rent for the months of December, 2009, January, 2010, and February, 2010.[7] However, she stated that “settlement of the monies on account for [Zoe]... are not clear nor is the right for [the Trustees] to set forth attorney’s fees and costs for alleged repair costs *189 in the premises without providing [Zoe] an opportunity to question the costs,” and went on to assess the damages as noted above. Zoe did not appeal the trial judge’s decision. The Trustees’ motion to amend followed.
On appeal, the Trustees argue that the court's award of attorney’s fees included only those fees for services in connection with the termination of Zoe’s lease and the negotiation of the Trustees’ new lease with Bikram Yoga. By the motion to amend, the Trustees were seeking to recoup also those fees incurred in relation to this action and the cross motions for summary judgment. The Trustees maintain that it was entitled to those fees, as well as the late fees, under Article XIX of the lease assumed by Zoe. Zoe, on the other hand, argues that once the lease was terminated pursuant to the December 7th agreement, the Trustees were entitled to attorney’s fees only under that agreement, and not under the lease, notwithstanding Zoe’s failure to comply with the agreement. Zoe discounts any effect of the “reservation of rights” provision in the December 7th agreement, arguing that “it is axiomatic that a reservation of rights could not have served to expand the rights” under the lease, which would relate only to a “unilateral termination of the lease... after an uncured default, as opposed to a termination “by mutual agreement of the parties.”
Both the “interpretation of an unambiguous contract” and the “preliminary question of the existence of an ambiguity in an agreement” are questions of law. Basis Tech. Corp. v. Amazon.com, Inc., 71 Mass. App. Ct. 29, 36 (2008). “Even if a contract might arguably appear ambiguous from its words alone, the decision remains with the judge if the alternative reading is inherently unreasonable when placed in context. Contract interpretation under Massachusetts law depends heavily on context and recognizes that words can have different meanings in different contexts.” McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2004). Moreover, a contract should be construed “with reference to the situation of the parties and to the objects sought to be accomplished,” Shea v. Bay State Gas Co., 383 Mass. 218, 223, quoting Bryne v. City of Gloucester, 297 Mass. 156, 158 (1937), and [i]t is neither reasonable nor practical to interpret [a] clause as being meaningless.” Id. at 225.
In this case, the lease clearly provided that the Trustees were entitled to attorney’s fees incurred as a result of the lessee’s default. Zoe defaulted and agreed in the December 7th document that it had “waived [its] right to cure the default.” Thus, Zoe was obligated to pay the rent for January and February of 2010. When Zoe failed to do so, the Trustees had to go to court to collect that rent. The lease also provided that rent unpaid for more than five days was subject to a $25.00 per day late fee. The unpaid rent in this case was long overdue by the time of the trial. However, Zoe argues that the provisions in the lease were made irrelevant by the provision in the December 7th agreement whereby the lease was “terminated.” In so arguing, Zoe ignores the reservation of rights provision in the agreement, which we conclude is not ambiguous. To reserve something is “ [t] o keep back, to retain, to keep in store for future or special use, and to retain or hold over to a future time.” Black’s Law Dictionary 1473 (Rev. 4th ed. 1968). Thus, each party was clearly retaining its rights under the lease. It would be an unreasonable interpretation of the agreement that the parties were reserving these rights, but then in the same sentence nullifying that reservation provision by agreeing that the lease was terminated. Although it is difficult to identify what rights Zoe would have sought to reserve, the agreement, albeit *190 drafted by the Trustees, was part of the arrangement allowing Zoe to break the lease. On the other hand, it is reasonable that a lessor, which had permitted a lessee to get out of its lease with ten months rent still due, would want to retain its right to recover that rent, and, as is typical, the legal expenses it incurred in doing so. Moreover, the December 7th agreement specifically provided that one of its purposes was to “mitigate whatever damages [the Trustees] may have suffered or will suffer as a result of [Zoe’s] default and termination of the lease” (emphasis supplied). As the trial court found, Zoe had not fulfilled its obligation to pay rent. Even if late fees are not typical in most leases, the reservation of rights provision here would also cover that obligation.[8]
Accordingly, the trial court’s denial of the motion to amend is vacated, and the case is returned to the trial court for a new hearing on the issue of damages and attorney’s fees.
So ordered.

 The Trustees’ motion that was dated November 10, 2011 was not docketed by the court until November 14,2011. However, counsel’s certificate of service indicated that it was mailed to opposing counsel “by e-mail, and via overnight mail” on November 10, 2011. Thus, the matter appears to be properly before us. See Davenport v. Broadhurst, 10 Mass. App. Ct. 182, 185 (1980). Zoe does not argue otherwise.

 In its brief, the Trustees characterized these events somewhat differently. They stated that after the December agreement, they “continued to search for a replacement tenant and conduct required build out work. Eventually, [the Trustees] found a subsequent tenant who commenced rent in March, 2010.”

 See Article I, Sec. 1(h) of the lease.

As noted above, the December rent appears to have been paid.

 Without so deciding, we note that late fees and interest may, to some extent, be duplicative.