NEW ENGLAND FINANCIAL RESOURCES, INC., & another[1]
*vs.* ELIAS P. COULOURAS & others.

No. 89-P-400.

Suffolk. November 14, 1990. - February 22, 1991.

Present: SMITH, KAPLAN, & GILLERMAN, JJ.

*Evidence*, Extrinsic affecting writing. *Contract*, Construction of contract. *Practice, Civil*, Summary judgment, Findings by judge. *Consumer Protection Act*, Unfair act or practice.

On a lender's claim for a $10,000 "termination fee" allegedly due under an agreement giving it an option to provide certain construction financing, and which required the borrowers to pay this fee in the event the lender did not provide the financing on terms no less favorable to the borrowers than those contemplated by the agreement, extrinsic evidence of the circumstances attendant on the making of the agreement was necessary in order to clarify the parties' obligations after the lender's offer of less favorable financing terms and the borrowers' subsequent abandonment of their plans for the construction project; the claim was not ripe for adjudication on a motion for summary judgment. [141-147]

At the jury-waived trial of businessmens' claims under G. L. c. 93A, the Consumer Protection Act, the judge's findings were adequate to support his conclusions that a corporation and its president had not engaged in unfair or deceptive acts or practices in connection with certain loan transactions. [147-149]

CIVIL ACTION commenced in the Boston Municipal Court Department on January 5, 1987.

On transfer to the Superior Court Department a motion for summary judgment as to certain claims was allowed by *John C. Cratsley*, J., and the remaining claims were heard by *Elbert Tuttle*, J.

[1]Robert J. Eisenberg, the president and chief operating officer of New England Financial Resources, Inc., was impleaded by the defendants pursuant to Mass.R.Civ.P. 13(h) and 20, 365 Mass. 759 and 766 (1974), as a defendant to their counterclaims.

*Edward H. Seksay* (*Valerie J. Stoupis* with him) for the plaintiff.

*Michael J. O'Reilly* for the defendants.

GILLERMAN, J. New England Financial Resources, Inc. (the company), commenced an action against Elias P. Coulouras and Louis G. Coulouras individually and as trustees and beneficiaries of the COB Trust (the trust)[2] claiming breach of a loan agreement and failure to pay interest on a mortgage note. A judge of the Superior Court granted summary judgment in favor of the defendants on the company's claims, and a second judge, after a bench trial, entered judgment for the company and Robert J. Eisenberg, the president of the company (see note 1, *supra*) on the defendants' G. L. c. 93A counterclaims and judgment for the defendants on the company's G. L. c. 93A claim against the defendants which had been asserted mid-trial. The company appealed from the part of the judgment incorporating the adverse summary judgment ruling, and the defendants appealed from the portion of the final judgment which dismissed their counterclaims. All of the claims and counterclaims arose out of an aborted real estate financing transaction. The principal item in dispute is a termination fee of $10,000 to which the company says it is entitled.

1. *The summary judgment.* The documents which the parties put before the motion judge revealed the following undisputed facts. On December 17, 1985, the company made a short term mortgage loan (bridge loan) of $500,000 to the defendants Louis G. Coulouras and Elias P. Coulouras as trustees of the trust (the trustees). The purpose of the loan, after payment of the outstanding land mortgage, was to provide funds needed for the environmental cleanup of property owned by the trust at 326 Cambridge Street in Boston. After the cleanup, an office building was to be constructed on the site and then leased to Massachusetts General Hospital. The bridge loan mortgage note matured on June 16, 1986, sub-

---

[2]Also named as defendants were Peter E. Coulouras and George E. Coulouras, additional beneficiaries of the trust.

ject to the right of the trustees upon ten days' prior written notice to extend the note an additional period of six months.

The bridge loan agreement, executed on the same day as the related mortgage note and mortgage security agreement, gave the company, in section 5, "a right of refusal[3] to provide all construction financing" upon various terms and conditions, including the following, which became the focus of dispute:

> "(c) Such loan [the construction financing] shall be non-recourse to the Borrower [the trust], except that the full completion of the Improvements shall be guaranteed by guarantors acceptable to the Lender [the company].

> .    . . .

> "(g) If the Lender [the company], for any reason, does not provide the construction financing to the Borrower [the trust], the Borrower shall pay the Lender a termination fee of $10,000. If the Lender agrees to provide such financing upon the terms [*sic*] less beneficial to the Borrower than provided herein, the termination fee shall not be due and payable to the Lender."

The effect of the phrase "non-recourse to the Borrower" in subsection (c) is to exempt the trust from liability on the note, with the lender's recourse being limited to the collateral, in this case the property subject to the mortgage. The parties are in agreement that the exception in subsection (c) for the guaranty of "full completion of the Improvements" meant that recourse to the guarantors would expire upon completion of the construction and the payment of all construction costs and expenses. The parties have referred to this limited liability of the guarantors as the limited recourse guaranty.

---

[3]The phrase "right of refusal" is not defined in the bridge loan agreement. We take the phrase to mean an option in favor of the company to provide the construction financing, if such financing is sought by the trust. Cf. *Roy* v. *George W. Greene, Inc.*, 404 Mass. 67, 69-70 (1989), *S.C.*, 408 Mass 721, 722 (1990).

The trust applied to the company for the construction financing on February 20, 1986,[4] and on March 12, 1986, the company issued its commitment letter proposing terms for a $2,500,000 construction loan (the commitment letter). The commitment letter included a provision that the trustees, individually, "shall be jointly and severally liable for the obligations and undertaking of the Borrower [the trust] in connection with the loan." (The parties have referred to this unlimited liability of the trustees as the full recourse guaranty.)

The commitment letter was accepted and signed by the trustees on April 4, 1986, a nonrefundable $25,000 commitment fee was paid to the company, and a closing on all final loan documents was required by June 4, 1986. As the documents then stood, the $10,000 termination fee might not be payable because the full recourse guaranty in the commitment letter was "less beneficial" to the trustees than the limited recourse guaranty of section 5(g) of the bridge loan agreement. However, the affidavits and deposition testimony of the parties were in conflict about the terms of the guaranty required for the construction financing. The company's president filed an affidavit, in support of the company's cross motion for summary judgment, to the effect that prior to the acceptance of the commitment letter on April 4, the trustees and the company understood and agreed that the full recourse guaranty described in the commitment letter was in error and that only a limited recourse guaranty, as set forth in the bridge loan agreement, was required.[5] This was denied in the deposition testimony of Louis G. Coulouras, a portion of which was attached to the affidavit of counsel to the defendants filed in opposition to the company's motion for summary judgment.

---

[4]The application for the construction loan identified the trustees individually as guarantors of the loan.

[5]A draft guaranty prepared by counsel to the company after April 4, 1986, in connection with the anticipated closing of the construction loan, set out the limited recourse guaranty, not the full recourse guaranty.

As of June 1, 1986, then, the commitment letter was to expire on June 4, and the bridge mortgage note was scheduled to mature on June 16. On June 2, 1986, the trustees gave written notice by certified mail to the company extending the maturity of the bridge mortgage note for an additional term of six months, as permitted by the note. The company claimed it never received this notice. (The bridge loan agreement contained a notice clause permitting notice by certified mail, but the mortgage note contained no such clause.)

On June 6, two days after the expiration of the commitment letter, the trustees requested in writing an extension of the commitment letter to July 30. On June 11, the company responded by offering to extend the commitment letter to July 30 as requested, but only if the trustees agreed to a full recourse guaranty. On June 19 the trustees notified the company that the property was to be sold and an extension to the commitment letter was not needed.[6] The company then notified the trustees on June 24 of the various fees and reimbursement of expenses to which the company was entitled under the expired commitment letter.

On June 27, a meeting among the trustees and company representatives was held to discuss payments due the company. An agreement was reached, reduced to writing, and signed by all parties on July 1. The new agreement reinstated the bridge loan and extended to December 17 all amounts due under the bridge loan agreement, the mortgage note, and the commitment letter. All amounts due the company, including costs and expenses of enforcement, were to be unconditionally guaranteed by the trustees individually.[7] The July 1 agreement detailed amounts due under the commitment letter and referred to amounts due under the mortgage note, but made no direct reference to the $10,000 termination fee described in the bridge loan agreement.

---

[6]This undisputed fact was contained in an affidavit filed by the company.
[7]The guaranty of the July 1 letter agreement covered all obligations under the "Loan Documents" (defined to include the bridge loan agreement, mortgage, and mortgage note) as well as the commitment letter.

However, on November 20 the company notified the trustees of all amounts to fall due on December 17, including the $10,000 termination fee. The total was $364,417.26, if funds were transferred by wire on the 17th.

On December 10 counsel to the trustees deposited "under protest" a bank treasurer's check in the amount of $353,979.71 to the account of the company at a local bank and gave written notice to the company of what he had done. The notice included a demand for a complete accounting of all transactions between the parties, including amounts due to, or due from, the company. The check cleared on December 15.

To maintain summary judgment entered in their favor, the defendants cite (as did the judge) the parol evidence rule which, the defendants say, precludes consideration of all extrinsic evidence of the oral agreement of a limited recourse guaranty offered by the company to contradict the full recourse guaranty set out in the later executed commitment letter, an unambiguous and integrated understanding of the parties.[8] See Liacos, Massachusetts Evidence 385 (5th ed. 1981). Without the disqualified evidence, the full recourse guaranty stated in the commitment letter negatives the trustees' obligation to pay the termination fee which, under section 5(g), depended on the availability of a limited recourse guaranty.

The difficulty is that the defendants' argument points to the wrong agreement. The parol evidence rule precludes evidence of earlier or contemporaneous discussions that would modify the provisions of a later integrated agreement which the proponent of the agreement seeks to enforce. Compare *Lunnie* v. *Gadapee*, 116 Vt. 261, 263 (1950) ("the parole evidence rule applies only where the enforcement of an obligation created by the writing is substantially the cause of action"). Here the company seeks to enforce a covenant in the

---

[8]Evidence of the oral agreement, as noted earlier, was contained in a company affidavit filed in support of its cross motion for summary judgment. Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). It was properly considered by the judge.

bridge loan agreement, not the commitment letter, which, because the project was abandoned by the trustees, became moot. Moreover, the commitment letter was superseded by the later written agreement of July 1 which purported to state the new and entire agreement of the parties, with the guaranty entirely eliminated because the project was no longer contemplated.[9]

The nub of the problem is the uncertainty of the meaning of the covenant to pay the termination fee in the context of what developed between the parties.[10] On June 19, following the company's offer to provide the construction financing, the trustees unilaterally aborted the project[11] with the consequence that the construction financing was never put in place. Does the first sentence of section 5(g) properly apply to those facts or does the second sentence of the same section override the first sentence upon proof, without more, of a single less favorable financing *offer* by the company? It is not at all clear, in the context of this dispute, what the parties intended the effect to be of the second sentence upon the first, and additional extrinsic evidence is required, not to modify the terms of the covenant, but to make its meaning clear. See *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 753 (1973) ("evidence of the facts and circumstances of the transaction, including the situation and relations of the parties, [is admissible] for the purpose of applying the terms of the written contract to the subject matter and removing and explaining

---

[9]It may nevertheless be, once the termination fee covenant is entirely understood, that merely the terms of the final agreement on the guaranty — full recourse or limited recourse — will determine the outcome of the claim to the termination fee. That, of course, would be a reason for admitting evidence of what was the agreement.

[10]Without doubt the bridge loan agreement, the mortgage note, and other documents closing the bridge loan, being part of a single transaction, were fully integrated agreements describing the final understanding of the parties. See *Stern* v. *Stern*, 330 Mass. 312, 317 (1953). The fact of integration, see *Wang Laboratories, Inc.* v. *Docktor Pet Centers, Inc.*, 12 Mass. App. Ct. 213, 219 (1981), does not foreclose interpretative issues, however.

[11]The record does not offer an explanation or the circumstances of this decision.

any uncertainty or ambiguity which arose from such application"); *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 851 (1973) (The "[p]aragraph [in question] is not self-interpreting . . . and the evidence could be received and used to elucidate its meaning in context"). See also 3 Corbin, Contracts § 579 (1960) ("Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by oral testimony"); Restatement (Second) of Contracts § 212(2) comment b (1979); *Parrish* v. *Parrish*, *ante* 78, 85-86 (1991).

The company's complaint was not ripe for adjudication upon a motion for summary judgment; "further exploration of the facts is necessary." *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 87 (1984). The interpretation of the bridge loan agreement requires evidence of the circumstances attendant on its making to resolve evident uncertainties. See *Robert Indus., Inc.* v. *Spence*, 362 Mass. at 755. Moreover, there is a sharp factual dispute between the parties as to the agreed terms of the company's offer of construction financing. If the termination fee issue is not resolved by the first sentence of 5(g), the adjudication of that dispute may become important.

2. *The bench trial.* The defendants appealed from the dismissal of their G. L. c. 93A counterclaims; they claim that the trial judge failed adequately to state the basis of his decision. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), requires a judge who sits without a jury to find the facts and state his conclusions of law, but the rule "does not require extensive detail and only imposes a duty on a judge to articulate the essential grounds for a decision." *Willis* v. *Selectmen of Easton*, 405 Mass. 159, 161 (1989). The extent of the detail will depend upon the circumstances of the case. *Id.* at 162. So long as the judge states his findings and the principles of law he applied in deciding the case, specific action by the judge on parties' requests for findings and rulings is not necessary. See *Petition of New Bedford Child & Family Serv. to Dis-*

*pense with Consent to Adoption*, 385 Mass. 482, 491 (1982); *Ricky Smith Pontiac, Inc.* v. *Suburu of New England, Inc.*, 14 Mass. App. Ct. 396, 404-405 (1982).

With these basic principles in mind, we examine each of the four claims of inadequate findings by the trial judge. First, the defendants complain that the judge failed to make a finding with regard to the promise of non-recourse financing in both the bridge loan agreement and the commitment letter — a promise, the defendants say, which was not fulfilled because of the deception of the company.[12] What the judge found, however, was "that all of the transactions between the parties to this litigation were taken after consultation by the defendants with counsel." The judge also ruled that the evidence failed to establish that the "plaintiff's conduct can be considered unfair, 'immoral, unethical, oppressive, or unscrupulous' " (quoting from *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 [1979]). In short, the judge found that there was no deception — that the defendants, acting under the advice of counsel, knew precisely what they were doing. See *Lowell Gas Co.* v. *Attorney Gen.*, 377 Mass. 37, 51 (1979). No further findings on this issue were needed.

Second, the defendants claim that there was no finding whether the commitment letter was induced by fraud. There were rulings to the contrary; we have quoted them in the preceding paragraph.

Third, the claim is made that there were no findings with regard to the extension of the mortgage note, and thus no finding whether the company's later conduct violated c. 93A. The judge found, however, that counsel for the defendants, in a letter to the company, pointed out the possibility of a c. 93A violation, and following that notice the trustees met with the company and entered into a fresh agreement rein-

---

[12]In the summary judgment proceedings the defendants claimed, not that there was deception, but that the full recourse guaranty which the parties agreed to was the basis for their denial of liability for the termination fee.

stating the loan. Those findings, together with the previously quoted findings, were all that was needed.

Finally, the defendants contend that the judge improperly failed to make findings with regard to their claim that demanding post-payment interest was a 93A violation. However, the judge found that there was insufficient evidence presented for the court to make any finding on that issue.

The substance of the defendants' claim is that the judge made the wrong findings, not inadequate findings. Rule 52(a), however, requires us to affirm the judge's findings unless they are "clearly erroneous." See *Willis* v. *Selectmen of Easton*, 405 Mass. at 165. It is plain to us that they were not.

The judgment for the defendants on the plaintiff's contract claims is reversed, and the case is remanded for trial on those claims. The judgment is affirmed with respect to the parties' c. 93A claims.

*So ordered.*