Eastern Holding Corporation & another[1] *vs.* Congress Financial Corporation (New England).

No. 07-P-1669.

Suffolk. December 10, 2008. - August 3, 2009.

Present: Berry, Smith, & Cohen, JJ.

*Contract,* Loan, Construction of contract, Performance and breach. *Loan. Practice, Civil,* Attorney's fees.

In an action seeking damages on account of the defendant's refusal to return cash collateral pledged by the plaintiffs to secure certain loans made by the defendant to the plaintiffs' subsidiaries, the trial judge erred in granting summary judgment in favor of the defendant, where the plaintiffs had the right to obtain the return of the collateral after notice of an event of default by making payment of the full amount of the debt; where there was no ambiguity in the underlying loan documents that would permit the introduction of extrinsic evidence supporting the defendant's contention that the plaintiffs had not met an essential condition for release of the collateral; and where questions of material fact remained on the issue whether the plaintiffs had in fact paid the full amount of the debt. [740-743]

Discussion of a party's entitlement to an award of attorney's fees should it ultimately prevail, after remand to the trial court, in a matter involving a pledge agreement providing for the payment of attorney's fees incurred by the party in defending its rights in the collateral. [743-744]

Civil action commenced in the Superior Court Department on July 15, 2004.

The case was heard by *Allan van Gestel,* J., on motions for summary judgment, and a motion for reconsideration was also heard by him.

*Donn A. Randall (J. Patrick Kennedy* with him) for the plaintiffs.

*Richard G. Haddad,* of New York (*Dennis E. McKenna* with him) for the defendant.

Cohen, J. The plaintiffs, Eastern Holding Corporation (EHC)

[1]Shelburne Corporation.

and Shelburne Corporation (Shelburne) (collectively, the plaintiffs), brought this lawsuit against the defendant, Congress Financial Corporation (Congress), seeking damages on account of Congress's refusal to return cash collateral pledged by the plaintiffs to secure certain loans made by Congress to the plaintiffs' subsidiaries (the borrowers) in the course of a lengthy financial relationship.[2] A judge of the Superior Court granted summary judgment to Congress, and this appeal ensued. For the reasons that follow, we conclude that Congress was not entitled to summary judgment and that the case must be remanded for further proceedings.

*Background.* The borrowers operated two large paper production mills in Maine. Their relationship with Congress began when, pursuant to an agreement dated September 30, 1997, Congress funded a term loan and a revolving loan, collateralized by a pledge of the borrowers' business assets. The revolving loan was based upon a "borrowing base," determined by a percentage of the borrowers' eligible accounts receivable and inventory. In general, the borrowers could borrow approximately eighty-five percent of eligible accounts receivable and sixty percent of eligible inventory; the borrowers could not borrow more than permitted by this formula, except at Congress's discretion.

The present dispute concerns three subsequent loans that came into being in 2002 and 2003. At that time, the borrowers were operating as debtors-in-possession in Chapter 11 bankruptcy proceedings, had additional cash needs, and negotiated with Congress to borrow additional funds on a revolving basis. The borrowers and Congress therefore entered into agreements and amendments to existing loan documents to create the so-called sixth, seventh and eighth supplemental revolving loans.

The sixth loan was secured by a pledge by EHC of $750,000 in cash collateral, which was equal to the maximum principal balance of that loan. Similarly, the eighth loan was secured by a pledge by Shelburne of $1 million, which was equal to the maximum principal balance of that loan. The seventh loan was

---

[2]The plaintiffs' amended complaint contains eight counts — four essentially identical counts for each plaintiff alleging breach of contract, breach of the implied covenant of good faith and fair dealing, misrepresentation, and violation of G. L. c. 93A.

secured by all previous collateral but was not secured by any new pledge of collateral, and had a maximum principal balance of $500,000.

For present purposes, the most salient terms of the agreements pertaining to the sixth, seventh, and eighth loans and the release of the pledged collateral may be summarized as follows: the release of each pledge of collateral was conditioned upon both the repayment of the loan it secured and the repayment in full of the seventh loan;[3] the sixth, seventh, and eighth loans had priority over previous loans made by Congress to the borrowers, in the sense that only after these three loans were repaid would the borrowers' payments be applied to other outstanding loans; and Congress had discretion to lend additional funds under all three loans in excess of their maximum principal balances.

As the motion judge concluded, it is not genuinely disputed that, in early December, 2003, an event of default occurred, permitting Congress to apply the collateral pledged in connection with the sixth and eighth loans.[4] On December 16, 2003, Congress gave written notice to the borrowers and the plaintiffs that an event of default had occurred, stating that, without waiving its rights, it would permit a preexisting forbearance agreement to remain in effect for the time being. It was not until January 29, 2004, that Congress announced its intention to apply the collateral. On the same date, the plaintiffs requested the return of the collateral. It is the plaintiffs' contention that, by January 29, 2004, the borrowers had fulfilled the conditions of release by paying in full the balances of the sixth, seventh, and eighth loans, and that Congress therefore was obligated to return the collateral.

---

[3] The release of the collateral securing the sixth loan was conditioned upon the payment in full of the obligations under the seventh and sixth loans, "in each case, including, without limitation (i) principal and interest and (ii) all fees, costs, expenses, and other charges in respect thereof to the extent determinable by [l]ender in good faith on the date such full release is requested." The release of the collateral securing the eighth loan likewise was conditioned upon the payment in full of the obligations pursuant to the seventh and eighth loans.

[4] The event of default was the borrowers' failure to maintain the minimum amount of net worth required to be maintained under an agreement with another lender. It had been agreed by the parties that an uncured default as to the other lender would be a default as to Congress.

On the plaintiffs' motion for partial summary judgment and Congress's cross-motion for summary judgment, the motion judge rejected the plaintiffs' position on the ground that the plaintiffs had lost all rights to the collateral when the event of default occurred, and that even if they subsequently paid the full balances of the sixth, seventh, and eighth loans prior to Congress's application of the collateral, they were not entitled to the collateral's return. As a result, he did not reach Congress's alternative argument that the plaintiffs had not, in fact, fully paid off the three loans prior to the application of the collateral.

*Discussion.* Summary judgment is appropriate where the records and pleadings "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). Our review of a summary judgment decision is de novo. *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997). *Zielinski* v. *Connecticut Valley Sanitary Waste Disposal, Inc.*, 70 Mass. App. Ct. 326, 334 (2007).

On the question of the plaintiffs' right to obtain the return of the collateral after notice of the event of default, the most pertinent case, cited by both the parties and the motion judge, is *Dana* v. *Wildey Sav. Bank*, 294 Mass. 462 (1936). In that case, the Supreme Judicial Court held that a bank's delay in exercising its right to liquidate securities that had been pledged as collateral for a loan was not a waiver of the bank's right to enforce the agreement and apply the collateral. *Id.* at 467. The court explained further, however, that while the bank's right to enforce the agreement became "absolute" prior to selling the collateral, the plaintiff still could have prevented the sale of the pledged securities by making payment of the full amount of the debt. *Id.* at 468. In other words, the rights of the secured creditor to apply the collateral remained subject to the debtor's right of redemption. *Ibid.* See G. L. c. 106, §§ 9-602, 9-623(*b*), and 9-624(*c*).

In the present case, Congress delayed in applying the collateral until January 29, 2004. Thus, under the rubric of *Dana* v. *Wildey Sav. Bank, supra,* and contrary to the ruling below, if the borrowers already had repaid the full indebtedness under the sixth, seventh, and eighth loans by that date, the plaintiffs had the right to the release of the collateral.

Congress argues that, even if the plaintiffs were able to obtain the return of the collateral upon full repayment of the sixth, seventh, and eighth loans, Congress still was entitled to summary judgment on the alternative ground that the borrowers, in fact, had not paid back the full indebtedness under these loans by January 29, 2004. Specifically, Congress contends that the seventh loan was a so-called "overadvance facility," the balance of which was equivalent to the amount by which the balance of all loans made pursuant to the original agreement and subsequent amendments exceeded the borrowing base. Congress maintains that, as an overadvance facility, the seventh loan could not be deemed repaid unless and until the total indebtedness was brought back "into formula," i.e., to a point where the borrowing base plus cash collateral equaled or exceeded the balance of all outstanding loans.

According to Congress, because the borrowers' economic condition had deteriorated at the beginning of 2004, and their accounts receivable and inventory had plummeted, the overadvance had increased by far more than the borrowers were able to muster in their payments during that period. Thus, under Congress's view, the seventh loan was not repaid in full by January 29, 2004, and an essential condition for release of the collateral was not met.

The problem with Congress's explanation of the nature and function of the seventh loan is that it is not expressed in the contract documents. The documentation for the seventh loan sets a loan limit not to exceed $500,000. Nowhere in the relevant agreements is there any language to support the view that the seventh loan would only be considered repaid if the borrowers also made payments sufficient to correct for any decline in the borrowing base. Significantly, the terms and conditions of the seventh loan are identical to those governing the sixth and eighth loans, except that the agreements for the sixth and eighth loans also contain provisions referring to the cash collateral pledged by the plaintiffs for those loans. The documentation for the seventh loan has no special provisions indicating that its outstanding balance would include any overadvance.

Because there is no contract language supporting Congress's interpretation of the seventh loan, we discern no ambiguity that would permit the introduction of extrinsic evidence as to the

parties' intentions in this regard.[5] Nor is there any ambiguity as to the priorities that Congress was required to follow in applying payments received from the borrowers. The loan agreements unambiguously required Congress to apply payments first to the loans at issue here and only then to other outstanding loans. Congress's only argument to the contrary again depends upon the assumption that the repayment of the seventh loan required the elimination of the overadvance, such that Congress could apply the plaintiffs' payments wherever necessary to correct the overadvance. Because we reject the view that the parties' agreements required the borrowers to eliminate the overadvance before the seventh loan would be considered repaid, we reject this argument as well.

The only remaining question is whether the borrowers did, in fact, transmit to Congress sufficient funds to pay off the balances, interest, and related fees of the sixth, seventh, and eighth loans by January 29, 2004. If so, the plaintiffs are entitled to the return of the collateral. The plaintiffs argue, as they did below, that there are no issues of material fact on this issue and that they are entitled to the entry of partial summary judgment on the two counts of their complaint alleging breach of contract. In support of that position, the plaintiffs contend that documents in the record and admissions by Congress establish unequivocally that, between the event of default and the plaintiffs' request for the release of the collateral, the borrowers made payments to Congress of at least $2,500,000. They contend further that the principal balances of the sixth, seventh, and eighth loans must

---

[5]The only material in the record that bolsters Congress's interpretation of the seventh loan is an affidavit from a former officer of Congress stating, in conclusory fashion, that the loan was an overadvance, and that "an overadvance is 'repaid' when the borrower's account is brought back within the lending formula." However, without any contract language lending support for these assertions, the affidavit is no more than an attempt to introduce ambiguity into the parties' contracts by contradicting their plain terms. Where contractual language is unambiguous, we do not resort to extrinsic evidence concerning the contracting parties' intent in order to ascertain the contract's meaning. *General Convention of the New Jerusalem in the United States of America, Inc.* v. *MacKenzie*, 449 Mass. 832, 836 (2007). *Brewster Wallcovering Co.* v. *Blue Mountain Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 617-618 (2007). We therefore disregard the affidavit and determine the meaning of the parties' agreements solely with reference to their unambiguous terms, as a question of law. See *Buchanan* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. 244, 247-249 (2005).

have totaled less than $2,225,000 because of the lending limits prescribed in the loan documents.

We have been unable to assure ourselves from the record that the loans, indeed, were repaid in full. The documentation in question is not self-explanatory. Moreover, we cannot be certain that the over-all principal balances of the three loans did not exceed the amounts specified in the agreements, given that Congress had the discretion to lend in excess of the prescribed limits. The case therefore is remanded for a factual determination whether the outstanding balances of the sixth, seventh, and eighth loans, plus any applicable fees and other charges specified in the parties' agreements, were fully paid by January 29, 2004, such that Congress was required to release the collateral.

As the outcome of this case remains to be determined, the motion judge's award of attorney's fees to Congress is vacated. However, because the issue may arise on remand, we briefly address the question of Congress's entitlement to an award of attorney's fees should it ultimately prevail.

The applicable pledge agreements provide for the payment to Congress of attorney's fees incurred in defending its rights in the collateral.[6] Although Massachusetts generally follows the "American rule," which holds each party responsible for its costs of litigation, an exception exists where the parties "provide in an agreement that, in certain circumstances, one of them may be obligated to pay the other's attorney's fees, incurred in asserting rights under the agreement." *Carter* v. *Warren Five Cents Sav. Bank,* 409 Mass. 73, 80 (1991). In particular, a provision requiring a borrower to pay a creditor the expenses, including litigation expenses and attorney's fees, spent in the protection of its rights under the terms of a lending transaction is enforceable. See *Leventhal* v. *Krinsky,* 325 Mass. 336, 340-342

---

[6]In the pledge agreements for the sixth and eighth loans, the attorney's fees provisions read as follows: "Pledgor shall promptly reimburse [p]ledgee on demand, together with interest at the rate then applicable to the [o]bligations set forth in the [l]oan [a]greement, for any charges, assessments or expenses paid or incurred by [p]ledgee in its discretion for the protection, preservation and maintenance of the [c]ollateral and the enforcement of [p]ledgee's rights hereunder, including, without limitation, attorney's fees and legal expenses incurred by [p]ledgee in seeking to protect, collect or enforce its rights in the [c]ollateral or otherwise hereunder."

(1950); *Trustees of Tufts College* v. *Ramsdell*, 28 Mass. App. Ct. 584, 585 (1990). Furthermore, such a provision allows a creditor to collect attorney's fees and other expenses incurred not only in prosecuting an affirmative claim, but also in defending a legal attack on its seizure of collateral. See *Penney* v. *First Natl. Bank of Boston*, 385 Mass. 715, 723 (1982). However, the court must ensure that any such award of fees is reasonable. See *Trustees of Tufts College* v. *Ramsdell, supra.* See also *Giuffrida* v. *High Country Investor, Inc.*, 73 Mass. App. Ct. 225, 244 (2008) (judge may adjust fee award to account for prevailing party's limited success). Accordingly, if Congress should prevail upon remand, an award of reasonable attorney's fees incurred in defense of its rights in the collateral would be appropriate.

*Conclusion.* We vacate the entry of summary judgment for Congress, as well as the order granting Congress its attorney's fees. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*