# United States Court of Appeals
## For the First Circuit

No. 10-1798

ANTHONY ARTUSO,

Plaintiff, Appellant,

v.

VERTEX PHARMACEUTICALS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

David W. Krumsiek, with whom Perry, Krumsiek & Jack, LLP was on brief, for appellant.
Alan D. Rose, with whom Amy R. Silverman and Rose, Chinitz & Rose were on brief, for appellee.

February 18, 2011

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA, Circuit Judge.** This case involves a dispute about what emoluments are due to an ousted executive under an employment agreement (the Agreement). The district court dismissed the complaint for failure to state a claim upon which relief could be granted. See Fed. R. Civ. P. 12(b)(6). The plaintiff now appeals the dismissal of his claims for breach of contract and breach of an implied covenant of good faith and fair dealing. Discerning no error, we affirm.

## I. BACKGROUND

Because this appeal follows a dismissal for failure to state a claim, we draw the facts from the complaint and those documents fairly incorporated into it. See SEC v. Tambone, 597 F.3d 436, 438 (1st Cir. 2010) (en banc); Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006).

The defendant, Vertex Pharmaceuticals, Inc., is based in Cambridge, Massachusetts. In the spring of 2008, an executive search firm acting on its behalf contacted plaintiff-appellant Anthony Artuso to gauge his interest in changing jobs. The plaintiff, then a highly paid executive at a rival pharmaceutical company, turned a deaf ear to these initial overtures. But the defendant persisted, and negotiations soon began.

The defendant stressed the availability of challenging work: it envisioned that the plaintiff would assume major responsibility in the marketing of a promising new drug. It also

-2-

painted a glowing picture of the prospects for lucrative financial rewards; in that regard, it proposed that the plaintiff would receive equity — stock and stock options — as part of a generous compensation package.

The plaintiff ultimately succumbed to these blandishments and, on June 26, 2008, the parties signed the Agreement. Its terms are of paramount importance here.

The Agreement specified that the plaintiff would serve as an at-will employee of the defendant with the title of vice-president for strategic planning. It displaced the earlier negotiations through an integration clause, which stated that the Agreement would "constitute the complete agreement between [the plaintiff] and [the defendant] regarding employment matters and will supersede all prior written or oral agreements or understandings on these matters."

As to compensation, the Agreement provided for a hiring bonus, an annual base salary, and "start-up equity." This start-up equity included the following:

Restricted Shares — 3,000

You will receive a restricted stock grant pursuant to Vertex's 2006 Stock and Option Plan. One quarter of the restricted shares will vest on each anniversary of your employment start date for as long as you remain employed by Vertex. Any shares that have not vested at the end of your employment will be forfeited.

Stock Options — 25,000

-3-

> In addition to your restricted stock grant, you will be granted a non-qualified stock option pursuant to Vertex's 2006 Stock and Option Plan. . . . The common stock subject to your stock option will vest in 16 quarterly installments over four years.
>
> The specific terms and conditions of the equity grants will be set forth in grant agreements, which, among other things, will incorporate the terms and conditions of . . . Vertex's 2006 Stock and Option Plan.

The Stock and Option Plan incorporated by reference into this portion of the Agreement provided in pertinent part:

> Except as otherwise provided in the applicable Stock Agreement . . . , if a Participant ceases to be an Employee . . . with the Company . . . before the Participant has exercised all Stock Rights, the Participant may exercise any Stock Right granted to him or her to the extent that the Stock Right is exercisable on the date of such Termination of Service. Any such Stock Right must be exercised within three months after the date of the Participant's Termination of Service . . . .

In addition, the Agreement stipulated that the plaintiff would be allowed to participate in the defendant's performance bonus program. The Agreement cited that participants in this program were eligible to receive cash bonuses at the end of each calendar year. Awards were pegged to 30% of an employee's base salary, modified by a factor in the range of 0-150%. The factor depended on the performance of both the employee and the company. In the end, however, bonus awards were "at the discretion" of the

-4-

company's board of directors. The Agreement did not circumscribe this discretion in any way.

The plaintiff worked under the Agreement for some sixteen months, beginning on July 14, 2008. During this interval, he received glittering performance reviews and the defendant experienced exceptional growth (some of which was tied to the marketing of the new drug).

Despite this auspicious beginning, the relationship did not last. On December 1, 2009, the plaintiff was told that, as part of a reorganization, his position would be eliminated and his employment terminated. The defendant assured the plaintiff that this decision was unrelated to any shortfall in his job performance. The denouement came swiftly; the plaintiff's last day of work was December 4, 2009.

At the time of the plaintiff's departure, some of his stock options had vested. The defendant afforded him the opportunity to exercise those options. Asserting that he was entitled to more, the plaintiff sought to receive his unvested stock options. He also asked for a prorated bonus for calendar year 2009. The defendant rejected both of these requests.

Invoking diversity jurisdiction, see 28 U.S.C. § 1332(a), the plaintiff brought suit in the United States District Court for the District of Massachusetts. He sought through the suit to obtain damages to compensate him for the loss of the unvested stock

options and the denial of a prorated bonus. His complaint propounded claims for negligent and intentional misrepresentation, promissory estoppel, breach of contract, and breach of an implied covenant of good faith and fair dealing. The defendant moved to dismiss all of the plaintiff's claims.

On June 8, 2010, the district court granted the defendant's motion. The court, ruling from the bench, concluded that nothing in the Agreement entitled the plaintiff to either the unvested stock options or a prorated bonus. This timely appeal followed.

## II.  ANALYSIS

We review a district court's disposition of a motion to dismiss for failure to state a claim de novo. See Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 5 (1st Cir. 2005). In conducting that review, we accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor. Tambone, 597 F.3d at 441.

With certain exceptions not relevant here, a complaint only needs to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although there is no need for "detailed factual allegations," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), the complaint must "contain sufficient factual matter, accepted as

-6-

true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). Accordingly, a complaint must include more than a rote recital of the elements of a cause of action; it must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Tambone, 597 F.3d at 442 (citing Twombly, 550 U.S. at 555).

Pleading standards are one thing; substantive law is another. In a diversity case, pleading standards are a matter of federal law. See Hanna v. Plumer, 380 U.S. 460, 473 (1965); Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32 (1st Cir. 2004). Substantive law has a different source: a federal court sitting in diversity must apply the substantive law of the forum state. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). This includes application of the state's conflict of law principles, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), so the choice of state law is not always mechanical.

For present purposes, we may eschew a choice of law analysis. In determining which state's law applies, a diversity court is free to honor the parties' reasonable agreement. See

-7-

Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991). In this case, both parties have acknowledged that Massachusetts law controls. We accept that plausible premise.

With this backdrop in place, we turn to the task at hand. This appeal, as framed by the plaintiff, boils down to two sets of claims. First, he contends that the defendant's refusal to afford him the benefit of the unvested stock options and to pay him a prorated bonus worked a breach of the Agreement. Second, he contends that these same failures breached an implied covenant of good faith and fair dealing. We address these sets of claims separately.

## A. **Breach of Contract**.

In Massachusetts, contract interpretation is in the first instance a matter of law for the court. Basis Tech. Corp. v. Amazon.com, Inc., 878 N.E.2d 952, 958-59 (Mass. App. Ct. 2008). Unless the court determines that an ambiguity exists, "the terms of an employment agreement must be deduced, construed, and enforced as written." Cochran v. Quest Software, Inc., 328 F.3d 1, 7 (1st Cir. 2003) (applying Massachusetts law). This is particularly true where, as here, the contract contains an integration clause. See New Engl. Fin. Res., Inc. v. Coulouras, 566 N.E.2d 1136, 1139 (Mass. App. Ct. 1991).

We begin our inquiry with the defendant's refusal to allow the plaintiff to exercise his unvested stock options. An

indispensable element in the pleading and proof of a breach of contract claim is the promise that the plaintiff seeks to enforce. See I & R Mech., Inc. v. Hazelton Mfg. Co., 817 N.E.2d 799, 802 (Mass. App. Ct. 2004). Here, the plaintiff asserts that he was promised the balance of his stock options regardless of whether he continued to work for the defendant.

Nothing in the Stock Options provision of the Agreement states explicitly whether or not the plaintiff would be entitled to unvested stock options upon the termination of his employment. But the Stock and Option Plan, which is incorporated by reference in that provision, explicitly and unambiguously precludes any such entitlement. Section 11 of that plan states that within three months of his termination, an option holder can "exercise any Stock Right granted to him . . . to the extent that the Stock Right [was] exercisable on the date of" his discharge. This language makes pellucid that a terminated employee is entitled only to those rights that were exercisable at the time of his discharge. Because the plaintiff's unvested stock options were not exercisable at the time he was sent packing, he was not entitled to those unvested options.

We summarize succinctly. Pursuant to the continued-employment clause of the Stock and Option Plan, the plaintiff's stock options ceased to vest when his employment ended.

Consequently, his rights associated with them vanished at that time.

The plaintiff offers two reasons for disregarding the continued-employment clause of the Stock and Option Plan. We find neither reason persuasive.

First, the plaintiff points to the following phraseology found at the beginning of the pertinent section of the plan: "Except as otherwise provided in the applicable Stock Agreement . . . ." This language does not help the plaintiff. Rather, it enables the company and prospective employees to contract around the provisions of the Stock and Option Plan. Here, however, the parties did not specify any alternative arrangement in the Agreement. Instead, the Agreement embraced the plan.

The plaintiff's second argument relies on a juxtaposition of the Stock Options and Restricted Shares provisions of the Agreement. The former contains no continued-employment language; the latter does contain such language: it directs that those shares will vest only as long as the employee is employed by the defendant. In the plaintiff's view, this disparity signifies that, as to stock options, there is no continued-employment condition. See, e.g., Cofman v. Acton Corp., 958 F.2d 494, 497 (1st Cir. 1992) (noting that the inclusion of specific language in one article of a contract may lead to an inference that the exclusion of that language in a separate article was deliberate).

This argument is profoundly flawed. It overlooks the Stock and Option Plan which is incorporated by reference in the Agreement's Stock Options provision. It similarly overlooks a fundamental distinction between the plaintiff's stock options and his restricted shares. The Stock Options provision granted the plaintiff rights to exercise options as the options vested. The Restricted Shares provision, by contrast, granted the plaintiff the shares themselves, with no requirement that he first exercise an option. Because the continued-employment clause of the Stock and Option Plan applied to "exercisable" rights, the plaintiff's stock options fell within its scope. With respect to stock options, this eliminated any need to write a continued-employment condition into the text of the Agreement. The restricted shares, however, were not "exercisable." They were granted outright when due. Thus, these shares did not come within the coverage of the pertinent language in the Stock and Option Plan. It was, therefore, necessary for the defendant to state explicitly in the Agreement that proper vesting of the restricted shares was tied to the plaintiff's continued employment. Seen in this light, the so-called disparity cannot bear the weight that the plaintiff piles on it.

As a fallback, the plaintiff posits that the Agreement must be read in the albedo of the parties' antecedent negotiations. He insists that the start-up equity portion of the Agreement, which

-11-

included both the Stock Options and Restricted Shares provisions, was the linchpin of the deal and that the tenor of the negotiations led him to consider the stock options as a kind of signing bonus (which would inure to him, come what may).

We agree with the plaintiff that antecedent negotiations may sometimes inform the "language, background, and purpose" of a contract. USM Corp. v. Arthur D. Little Sys., Inc., 546 N.E.2d 888, 893 (Mass. App. Ct. 1989). But this principle has well-defined limits. The plain language of the contract controls, without embellishment, unless that language is imprecise or equivocal. See Hubert v. Melrose-Wakefield Hosp. Ass'n, 661 N.E.2d 1347, 1351 (Mass. App. Ct. 1996). Only in the event of linguistic uncertainty may a court refer to antecedent negotiations as a method of clarifying the meaning of contractual terms. Id.

Nothing in the Agreement guarantees the plaintiff the benefit of his unvested stock options regardless of his continued-employment status. "[W]ords that are plain and free from ambiguity must be construed in their usual and ordinary sense." Cady v. Marcella, 729 N.E.2d 1125, 1129 (Mass. App. Ct. 2000) (citation and internal quotation marks omitted).

In this instance, the plaintiff argues that the interaction between the Agreement and the Stock and Option Plan is sufficiently perplexing to create an ambiguity. This argument elevates hope over reason.

Incorporation by reference is a common tool in the drafting of contracts. See, e.g., Warren Freedenfeld Assocs., Inc. v. McTigue, 531 F.3d 38, 49 (1st Cir. 2008); Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 156 (1st Cir. 2005). Employing this drafting technique does not, in and of itself, create ambiguity. See Warren Freedenfeld Assocs., Inc., 531 F.3d at 49. The relevant provision is clear as a bell. The Agreement states not once, but three times, that the terms of the Stock and Option Plan, which are themselves crystal clear, comprise a part of the bargain between the parties. Under these circumstances, the plaintiff cannot plausibly complain of an ambiguity. See E. Holding Corp. v. Cong. Fin. Corp., 910 N.E.2d 931, 935 (Mass. App. Ct. 2009).

That ends this aspect of the matter. Pursuant to the clear terms of the Agreement, the plaintiff's stock options continued to vest only in the event that his employment endured. The plaintiff is entitled only to the benefit of the bargain that he struck, nothing more. See Cochran, 328 F.3d at 7; Schwanbeck v. Fed.-Mogul Corp., 592 N.E.2d 1289, 1292 (Mass. 1992). Because the plaintiff had no right to exercise the unvested options, the defendant did not breach the Agreement when it refused to grant him the benefits of those options upon his termination.

The plaintiff's second breach of contract claim rests on the notion that the defendant wrongfully declined to pay him a

prorated bonus for the forty-nine weeks that he worked in 2009. This claim, though it has a certain equitable attractiveness, lacks force.

To begin, the plaintiff's claim of entitlement to a prorated bonus depends on a misreading of the Agreement. The provision dealing with bonuses reads in pertinent part: "If you commence your employment prior to November 1 of a calendar year, you will [be] eligible to participate in the bonus program for that year on a pro-rated basis." Because the plaintiff commenced his employment with the defendant prior to November 1, 2008, he received a prorated bonus for that year.

The next year — 2009 — stands on a different footing. The provision in question does not contemplate a prorated bonus for an employee who was on the payroll at the start of a given calendar year. The plaintiff was, of course, on the payroll at the start of 2009 (the year for which he now claims a prorated bonus). Therefore, the "prorated bonus" provision in the Agreement does not apply.

In all events, the Agreement only makes the plaintiff "eligible to participate in [the defendant's] performance bonus plan." The Agreement does not guarantee the plaintiff a bonus, nor can such a guarantee plausibly be inferred. Under the Agreement and the performance bonus program, "[a]ll bonus awards are made at the discretion" of the defendant's board of directors.

-14-

Furthermore, any such award can be as little as 0%, regardless of performance. As these provisions make clear, even an employee who works diligently and to good effect throughout the calendar year is not assured of a bonus.

In an effort to salvage this claim, the plaintiff suggests that discovery would supply evidence that the board's discretion did not extend to specific bonus amounts but, rather, was limited to formulating policy. This suggestion is fruitless for at least two reasons.

First, a plaintiff whose complaint does not state an actionable claim has no license to embark on a fishing expedition in an effort to discover a cause of action. See McCloskey v. Mueller, 446 F.3d 262, 271 (1st Cir. 2006); DM Research, Inc. v. Coll. of Am. Path., 170 F.3d 53, 55 (1st Cir. 1999). Second, even if the plaintiff discovered extrinsic evidence of how the board habitually exercised its discretion, that evidence would be irrelevant because the clear contractual language itself affords the board unfettered discretion to deny him a bonus.

B. **Implied Covenant of Good Faith and Fair Dealing**.

A covenant of good faith and fair dealing is "implicit in all Massachusetts contracts, including contracts for employment at will." Harrison v. NetCentric Corp., 744 N.E.2d 622, 629 (Mass. 2001). Traversing the same ground that we have just explored, the

plaintiff presses counterpart claims premised on this covenant. These claims go down a blind alley.

We begin with bedrock. Under Massachusetts law, an employer has "an unfettered right to discharge" an at-will employee. Cochran, 328 F.3d at 7. The discharged employee may nonetheless recover "unpaid compensation if the employee [was] terminated in bad faith and the compensation is clearly connected to work already performed." Harrison, 744 N.E.2d at 629. So viewed, the implied covenant serves to "preclude an employer from taking an unfair financial advantage." Cochran, 328 F.3d at 8.

In the case at hand, the plaintiff's implied covenant claims founder because his complaint contains only a threadbare allegation that "the defendant terminated [him] in bad faith." This statement is unaccompanied by any factual allegations that might give rise to an inference of bad-faith conduct — an essential component of a claim under the implied covenant. See Harrison, 744 N.E.2d at 629; see also Sargent v. Tenaska, Inc., 108 F.3d 5, 8 (1st Cir. 1997).

While an allegation of "bad faith" is in a sense a factual allegation, it is so subjective that it fails to cross "the line between the conclusory and the factual." Twombly, 550 U.S. at 557 n.5. Such a bare-boned allegation cannot, without more, defeat a motion to dismiss for failure to state a claim. See Iqbal, 129 S. Ct. at 1951; Peñalbert-Rosa v. Fortuño-Burset, ___ F.3d ___, ___

(1st Cir. 2011) [No. 09-2391, slip op. at 6]; <u>Tambone</u>, 597 F.3d at 442; <u>see</u> <u>also</u> <u>Harrison</u>, 744 N.E.2d at 629.  It is reasonable to expect that, if the plaintiff had any basis beyond speculation for asserting a claim of bad faith, he would have described that basis in some detail in his complaint, or at the very least mentioned it in opposing the motion to dismiss.  <u>Peñalbert-Rosa</u>, ___ F.3d at ___ [slip op. at 8].

The defendant's stated reason for terminating him was a reorganization at the company.  The plaintiff did not challenge this reason, either below or on appeal.  Although the defendant praised his job performance and the termination occurred shortly before he would otherwise have been eligible to collect a bonus and more stock, the plaintiff neither tied these facts directly to his bad faith claim nor suggested that the reorganization was a sham.[2] If he had intended to ground his bad faith claim on those facts, he should have done more to develop that position.  If he made inquiries of the management or his friends in the company as to whether a real reorganization was planned or had ensued and got insufficient answers, he should have said so; if he did not pursue the inquiry, that is his fault.  It was up to him to make the effort to adduce the evidence for inclusion in the complaint.

---

[2] Indeed, at oral argument in this court, the plaintiff's counsel conceded that his breach of contract claims and his bad faith claims were inextricably intertwined and rested on the same factual premise.

-17-

Because implied covenant claims are all too often attempts to mend an infirm contract claim, it is especially prudent in such cases to insist on a real showing.

Without such specific information, the plaintiff's allegation "bears insignia of its speculative character," betokening that it constitutes only mere possibility. Id. at ___ [slip op. at 7]; see Tambone, 597 F.3d at 442. It follows from the above that the plaintiff's conclusory allegation of bad faith cannot satisfy the applicable pleading standard. The plaintiff's claims under the implied covenant are, therefore, subject to dismissal.

## III.  CONCLUSION

We need go no further. For the reasons elucidated above, we uphold the district court's dismissal of the plaintiff's complaint.


**Affirmed**.