NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1758                                    Appeals Court

        JUDITH BELUSHI PISANO vs. VICTOR RENO PISANO.


                     No. 13-P-1758.

        Dukes.     October 6, 2014. - May 29, 2015.

        Present:  Cypher, Grainger, & Maldonado, JJ.


Divorce and Separation, Alimony, Appeal, Judgment.  Husband and
    Wife, Antenuptial agreement.  Contract, Antenuptial
    agreement.  Practice, Civil, Bifurcated trial,
    Interlocutory appeal.



    Complaint for divorce filed in the Dukes County Division of
the Probate and Family Court Department on October 20, 2010.

    The case was heard by Spencer M. Kagan, J.


    Robert J. Rutecki for the husband.
    Sharon D. Meyers for the wife.


    CYPHER, J.  In October, 2010, Judith Belushi Pisano

(hereinafter, wife), after some twenty years of marriage to

Victor Reno Pisano (hereinafter, husband), filed a complaint for

divorce from the husband.  The wife also moved, successfully, to

bifurcate the issue of the scope and validity of a premarital

agreement executed by the parties on October 6, 1990, the day prior to the parties' wedding. Following a trial on the wife's "bifurcated complaint for divorce," a judge of the Probate and Family Court issued a "Bifurcated Judgment" dated April 2, 2012, supplemented by findings, in which he determined that the premarital agreement was valid and binding on the parties, and that it limited any claim of the husband for alimony in a manner we shall discuss more fully below.

With the assent of the parties, additional issues were referred to a master, who was instructed to conduct an evidentiary hearing, make findings of fact and conclusions of law, and prepare a judgment of divorce nisi addressing all outstanding issues. Among the issues considered by the master was whether the wife was entitled to the repayment of temporary alimony ordered earlier by the court and whether a certain debt should be treated as a liability of the wife or a joint marital liability to be shared by the parties. Following a hearing, the master issued his report (including recommendations that the wife recover the temporary alimony she paid to the husband and that the loan be treated as the wife's sole liability), and a subsequent amended report. The master's recommendations were

incorporated into the supplemental judgment of divorce nisi dated February 5, 2013.[1]

The husband has appealed, challenging portions of the "bifurcated judgment" as they pertain to alimony as well as the order contained in the supplemental judgment for repayment of temporary support. The wife has also appealed, challenging the judge's determination concerning the debt.[2]

For the reasons set forth herein, we vacate so much of the supplemental judgment as requires the husband to reimburse (or credit) the wife for sums paid for temporary alimony. In all other respects, we affirm the judgment.

1. Background.[3] In late December, 1988, the husband, who had previously been married, and the wife, a widow, "agreed to marry and discussed that a premarital agreement was necessary to protect various assets each had acquired, including intellectual property rights they intended to exploit or continue to develop in the future and that each wanted to protect in the event of

---

[1] The bifurcated judgment did not grant the parties a divorce. On May 28, 2013 (nunc pro tunc as of April 2, 2012), the judge issued a "Rule 60 (a) Corrected Bifurcated Judgment of Divorce Nisi" which granted the parties a divorce.

[2] The appeals were originally docketed under separate numbers; both appeals have since been consolidated.

[3] The parties, in their respective statements of fact, recite in some detail their personal situations and the events leading up to the execution of the premarital agreement. For purposes of our background statement, we shall do the same.

divorce, separation or death."  The wife had valuable real property located in Martha's Vineyard as well as an interest in her parents' house in New Jersey.  The wife also had valuable intellectual property rights, including rights she inherited from her late husband, the actor/comedian, John Belushi.  While the wife had achieved some success in her own right as an author, writer, producer, and speaker, her income was derived primarily from royalties and residuals from the intellectual property rights she inherited from Belushi.

The husband is involved in the entertainment industry and, prior to the marriage, had, among other things, written, produced and co-directed a successful television miniseries, produced a concert television special, and written scripts or concepts for several full length screenplays, one of which was sold to a studio.  The husband had also negotiated various business transactions regarding production, residual rights, and intellectual property and royalty payments for himself and his production company.

Prior to the execution of the premarital agreement, the parties discussed terms to be included therein.  The judge found that both parties desired to protect their existing assets, including their intellectual property rights, from one another, i.e., "what was Husband's would remain Husband's and what was

Wife's would remain Wife's, and any new project that they created together they would share."

Each party consulted with counsel, and although there was some confusion as to whose counsel would actually prepare the prenuptial agreement, the agreement was ultimately drafted by the wife's counsel. The "'draft' final agreement" prepared by the wife's counsel was further negotiated by the parties on October 6, 1990, and after certain revisions were made, the agreement was executed that same day. The agreement, excluding schedules, is eleven pages in length.

The premarital agreement provides, in part, in its introductory paragraph, that the parties "wish to enter into this Premarital Agreement for the purpose of defining the respective rights which each of us shall have in the property and estate of the other, both during our marriage and after its termination, either by a separation or the dissolution of our marriage or by the death of either of us." The parties set out in paragraphs 1.1 and 1.2 of the agreement, and in attached Schedules "B" and "C," the property each had acquired prior to the intended marriage.[4] Paragraph 2 of the agreement describes,

---

[4] The wife's assets and liabilities are listed in Schedule C of the agreement. In her "Notes to Statement of Assets and Liabilities," the wife recites that her primary source of income is from "royalties and residues on John Belushi and/or Blues Brothers movies, records and videos in addition to licensing income from the exploitation of the name and likeness of John

and essentially defines, separate and marital estate property.[5,6]

In paragraph 2.3, the parties agreed that "[e]ach of us shall have complete ownership and control of our Separate Property and

---

Belushi and the Blues Brothers."  The wife stated that her right to receive the royalties and residuals, as well as her right to exploit the name and likeness of her late husband and the Blues Brothers, represent valuable assets, albeit assets that are difficult to value as it is "impossible to predict with any degree of accuracy what income stream they might generate in the future."  Although there was fluctuation in the amounts of income received by the wife from her intellectual property interests, the amounts were substantial.

[5] Paragraph 2.1 provides:  "Separate Property of each of us as used herein shall include:  (a) the property described on Schedules B and C and any other property owned by the party on the date of this Agreement; (b) any property or other proceeds derived from the sale or exchange of the property described on Schedules B and C or from any other Separate Property of the party; (c) all income derived from the property described on Schedules B and C or from any other Separate Property of the party; (d) any increases in the value of the property described on Schedules B and C or in the value of any other Separate Property of the party; (e) any property which either party may inherit or receive by gift, will, laws of intestacy, or otherwise . . .; and (f) any property received as a result of a reorganization, sale, exchange, liquidation or other disposition of the property on Schedules B and C or any other Separate Property of the party."

[6] The premarital agreement was amended in August, 1996.  By virtue of the amendment, the parties deleted paragraph 2.2 of the original agreement and substituted the following in its place:  "Our Marital Estate Property shall include 1) any property owned or acquired by us which is not classified as Separate Property in subparagraph 2.1 above, 2) any property owned or acquired by us as tenants by the entirety or as joint tenants with right of survivorship regardless of the source of funds used to acquire such property, including any real estate occupied by us as our principal residence or vacation home, 3) any property devoted to a business venture of either of us..., and 4) any other property which we may, by written amendment to this agreement, classify as Marital Estate Property."

may use and dispose of such property in the same manner as if our marriage had not taken place."

The agreement provides in paragraph 7, entitled "Dissolution of Marriage:"

"7.1  We have been informed by legal counsel that it is not possible to advise us specifically what our rights would be if our marriage were terminated by divorce.  Generally, under existing Massachusetts law, in the absence of this Agreement, a court would provide for the division or other disposition of the property of either or both of us in a manner which was just and proper under all of the circumstances. In addition, a court could provide for the payment of alimony by either of us to the other in amounts considered just and proper.

"7.2  We recognize that, under existing Massachusetts court decisions and provisions of the Massachusetts General Laws, we may enter into an agreement prior to our marriage concerning the disposition of our property in the event of a separation or the dissolution of our marriage and that the agreement will be enforced unless, with respect to alimony, enforcement would cause one of us to become eligible for support under a program of public assistance at the time of the separation or dissolution.

"7.3  If we are legally separated or our marriage is dissolved and a decree of separation or dissolution is entered by a court of competent jurisdiction, we agree that each of us will have the following rights:

(a)  Except for the Marital Estate Property, as defined in paragraph 2.2 above, neither of us shall have any rights in or to the real or personal property owned by the other prior to our marriage or subsequently acquired by the other at any time during our marriage.

(b)  [The wife] shall be entitled to her Separate Property as defined in paragraph 2.1 above.

(c)  [The husband] shall be entitled to his Separate Property as defined in paragraph 2.1 above.

(d) The Marital Estate Property shall be divided equally between us.

(e) Each of us will pay the costs of our own attorney's fees and expenses of litigation.

"7.4 We agree that the provisions in this paragraph for our benefit are fair and reasonable."

Finally, in paragraph 12, the agreement contains an "integration" provision that recites, inter alia: "This agreement constitutes the entire and complete agreement between us as to our property rights and personal obligations arising from our marriage. All prior or contemporaneous agreements and understandings are merged into this Agreement."

After the wife filed her complaint for divorce in October, 2010, the husband sought temporary alimony, and by a temporary order dated February 16, 2011, the wife was ordered to pay to the husband the sum of $2,000 a month.

2. The bifurcated proceedings concerning the premarital agreement. At the hearing on the wife's bifurcated complaint, the husband challenged the validity of the premarital agreement. The judge, on all the evidence, concluded that the agreement was valid, fair, and reasonable at the time of its execution, and fair and reasonable at the time of trial. Moreover, the judge rejected the husband's claim that the agreement was the product of coercion or duress.

The judge also made findings with respect to the question of alimony under the agreement, stating: "<u>Section 7 does not waive the right of either spouse to put forward a claim of alimony per se</u> [emphasis in original] -- it only modifies and limits that right by restricting the assets and income from which alimony could be drawn to marital property (including income from marital property) acquired during the marriage, and further limits payment of alimony from Separate Property (including income from such property) unless one spouse would qualify for public assistance."

The judge elaborated on the point in his rationale for decision:

> "Husband waived any rights to alimony using the income from the Wife's intellectual rights. Husband still has the right to seek alimony in the future if he becomes a public charge. The Agreement does not contain a[n] express waiver of all alimony, but only a partial waiver of alimony so long as the parties were not left as a pauper, as that was not the intent of the parties. The parties' Premarital Agreement only modifies the right to alimony by precluding the use of income from Separate Property to fund the alimony."

The judge also stated: "The limitation in the Premarital Agreement provides alimony for Husband may be funded from Wife's Separate Property only if without such alimony he would qualify for public assistance."[7]

---

[7] The judge noted that by virtue of the premarital agreement the husband will have substantial assets (worth approximately $600,000) that should prevent him from becoming a public charge.

The judge reserved the award of alimony to either party from marital property or marital income until after the determination of division of assets and liabilities consistent with the premarital agreement was completed. As we have indicated, by a "bifurcated judgment" dated April 2, 2012, the judge concluded that the parties' premarital agreement was valid and binding on the parties.[8]

Shortly after the bifurcated judgment was entered, the wife filed a motion, supported by the affidavit of her business manager, to terminate temporary alimony, stating that all of the income currently being received by her comes within the definition of her separate property under the premarital agreement and is not subject to a claim by the husband or a division by the court. By temporary order dated May 22, 2012, the wife's obligation to pay the husband $2,000 a month as temporary alimony was suspended.

3. _The bifurcated proceedings before the master_. Pursuant to the order of reference, the master was bound by the bifurcated judgment, and the findings of fact, rationale and

---

Continuing, the judge stated that if, for any reason, these assets were depleted and the husband met the statutory criteria for alimony he has the ability to petition the court for relief.

[8] The judge also ordered counsel for the parties to submit asset schedules identifying those assets which they agreed were either separate property or marital property under the agreement. The matter was scheduled for a status conference for the "remaining issues" to be decided by the judge.

conclusions of law dated April 2, 2012, regarding the judge's ruling as to the enforceability and interpretation of the parties' premarital agreement.[9] The master was to conduct evidentiary hearings and address all outstanding issues which remained under the wife's complaint for divorce.

The master was presented with a number of issues, including whether the wife received, or currently receives, any income which is not separate property on which the husband was entitled to or had a right to seek alimony. The parties also identified to the master additional disputes, including whether the temporary alimony paid by the wife was improperly paid from income derived from the proceeds of the wife's separate property (and whether the amounts paid should be credited to the wife), and whether a $100,000 debt owed to the brother of the wife's late husband was a joint marital debt or the debt of the wife.

The master determined that there was "no marital income in dispute from which alimony could be paid." As to the question whether the wife should be credited for the amounts of temporary alimony paid by her to the husband ($32,000), the master found, as we shall discuss more fully, infra, that the wife made the required payments from monies that were her separate property

_____

[9] The parties filed a joint status memorandum identifying the husband and wife's separate property and their joint marital property. See note 8, supra. The wife's separate property included the intellectual property rights she inherited from her late husband.

under the premarital agreement and that the husband had been unjustly enriched by $32,000 and must repay that sum to the wife. Finally, with respect to the $100,000 loan, the master concluded that the debt should be the responsibility of the wife. As we have stated, the recommendations contained in the master's report, and the amended report, were incorporated in the supplemental judgment dated February 5, 2013. The husband filed his notice of appeal from the supplemental judgment on February 20, 2013; the wife filed her notice of appeal on March 5, 2013.

4. The husband's appeal. a. Construction of the premarital agreement. The husband argues generally that the judge "erred in construing the terms of the prenuptial agreement as constituting a waiver of [his] right to alimony from the income designated as the separate property of the wife in the prenuptial agreement."[10]

Before addressing the husband's argument, we consider the wife's contention that the husband's appeal of the court's "finding" that he had knowingly waived his right to receive alimony from the wife's separate property is untimely because it was not filed within thirty days of the entry of the bifurcated

---

[10] The husband's argument on appeal is directed towards the judge's construction of the premarital agreement. The husband states in his brief that he "has not appealed the trial judge's ruling that the prenuptial agreement is valid and enforceable."

judgment. See Mass.R.A.P. 4(a), as amended, 430 Mass. 1603 (1999); Onello v. Twomey, 35 Mass. App. Ct. 671, 675-676 (1993). More specifically, the wife states that the bifurcated judgment dated April 2, 2012, constituted a final judgment on the scope and validity of the premarital agreement, and that if the husband intended to object to the judgment (and any findings contained therein) he was obligated to, but did not, file his notice of appeal by May 2, 2012. Continuing, the wife asserts that the husband's appeal from the supplemental judgment of divorce nisi, which the husband treats as encompassing the bifurcated judgment, does not bring the bifurcated judgment before this court. In response, the husband asserts that only final judgments entered in the Probate Court are appealable as of right to this court, see Borman v. Borman, 378 Mass. 775, 779 (1979); McDonnell v. McDonnell, 39 Mass. App. Ct. 932, 933 (1995), and that the bifurcated judgment is an interlocutory order because it does not dispose of all claims raised by the underlying complaint for divorce.

We agree with the husband that, notwithstanding its nomenclature, the "bifurcated judgment" is, in essence, an interlocutory order, and that the "supplemental judgment of divorce nisi" constitutes the final judgment in this matter. Our conclusion finds support in our decision in Halperson v. Halperson, 65 Mass. App. Ct. 909 (2006). In Halperson, the

Probate Court judge ordered the question of the validity of the parties' antenuptial agreement bifurcated from the remainder of the divorce action. After a trial on the antenuptial agreement, a different judge ruled that the agreement was invalid and a "judgment" was entered to that effect. The remaining issues of the parties' divorce remained pending and the husband's attempts to stay proceedings in the Probate Court pending determination of the appeal were unsuccessful. We held that the husband's appeal "from the judge's interlocutory ruling on the validity of the antenuptial agreement accordingly is not properly before us," and we remanded the matter to the Probate Court for determination of the underlying case. In so holding, we pointed to the various considerations militating against our consideration of piecemeal appeals. We also stated that "the 'judgment' [did] not dispose of all issues in the case; accordingly, without a certification of the type required under Mass.R.Civ.P 54(b) . . ., it was not final and, hence, not ripe for appeal." 65 Mass. App. Ct. at 909.[11] We noted, in addition, that the trial judge did not report the question under the

_____

[11] We expressed no view on whether the question of the validity of an antenuptial agreement is a separate "claim" appropriate for certification under rule 54(b).

extraordinary vehicle of Mass.R.Civ.P. 64(a), as amended, 423 Mass. 140 (1996).[12]

In the instant matter, unlike in Halperson, the judge determined that the agreement was valid and enforceable.  Yet, the record makes clear, as we have discussed, that the judge's determination did not dispose of all issues involved in the underlying divorce action.  The same considerations militating against piecemeal appeals have application here.  In the circumstances, we decline to conclude that the husband's appeal is untimely.[13]

We turn to the husband's arguments concerning the judge's construction of the premarital agreement.  The husband asserts that the agreement contains no waiver of the parties' rights to alimony upon divorce,[14] that the waiver of the parties' claim to the other's separate property does not constitute a waiver of

---

[12] We recognize that DeMatteo v. DeMatteo, 436 Mass. 18 (2002), involved a procedural scenario where the probate judge, in a bifurcated proceeding to consider the validity and enforceability of an antenuptial agreement, concluded that the agreement was not fair and reasonable.  The husband appealed and the Supreme Judicial Court granted his application for direct appellate review and considered his arguments.

[13] Nor do we construe the husband's general statement in his brief that he was not appealing the judge's ruling that the premarital agreement was valid and enforceable, see note 10, supra, as a waiver of any argument concerning the judge's interpretation of the agreement with respect to alimony.

[14] The husband also points out that the wife's attorney who drafted the agreement testified that she did not include an alimony waiver in the document.

the parties' alimony right on income from the separate property, that the judge failed adequately to distinguish between a waiver of a property interest and a waiver of alimony (which constitute two separate and distinct rights), and that the ruling resulted in effect as an unknowing and involuntary implied waiver of his alimony rights under G. L. c. 208, § 34, contrary to established law and the public policy of the Commonwealth.  In the husband's view, the parties' agreement should have been interpreted by the judge "so as to permit either party to seek alimony from the other based on traditional principles of alimony without regard to the source or nature of the income which forms the basis of the supporting party's ability to pay."  The husband asserts that the judge's failure to so construe the agreement constitutes reversible error.

"When the words of a contract are clear, they must be construed in their usual and ordinary sense. . . ." General Convention of the New Jerusalem in the United States of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007).  Extrinsic evidence may be admitted, however, "when a contract is ambiguous on its face or as applied to the subject matter."  Id. at 836.  See Parrish v. Parrish, 30 Mass. App. Ct. 78, 86 (1991).  "Even when an agreement is integrated, evidence may be received and

used to elucidate (but not contradict) its meaning in context."

Parrish v. Parrish, 30 Mass. App. Ct. at 86 n.11.[15]

We start with the observation, made clear from paragraphs 2 and 7.3 of the premarital agreement, that each party sought to protect from the other his/her separate property, including the income streams derived from, and any appreciation in value of, that property. That the parties were to control all aspects of their separate property, including the income streams, is also manifest in paragraph 2.3, which allows the parties to control, use and dispose of their separate property in the same manner as if the marriage had not taken place.

Construing the agreement as a whole, see General Convention of the New Jerusalem, supra, at 835, paragraph 7.1 provides that "[g]enerally, under existing Massachusetts law, in the absence

---

[15] In their briefs, the parties do not rely solely on the language of the agreement itself; they also point to evidence adduced at the bifurcated hearing (and/or certain of the judge's findings thereon) that may bear on the parties' circumstances, intent and the meaning to be attributed to the language of the agreement. The wife does so even in the face of her assertion in her brief that the language of the agreement is plain and unambiguous. See e.g., Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 48 (1991) ("As a general principle, a court considers extrinsic evidence to discern intent only when a contract term is ambiguous"); Eastern Holding Corp. v. Congress Fin. Corp. (New England, 74 Mass. App. Ct. 737, 742 n.5 (2009) ("Where contractual language is unambiguous, we do not resort to extrinsic evidence concerning the contracting parties' intent in order to ascertain the contract's meaning"). The judge made no specific finding as to whether the premarital agreement was ambiguous or unambiguous; his conclusions of law refer to principles applicable to each scenario.

of this agreement, . . . a court could provide for the payment of alimony by either of us to the other in amounts considered just and proper" (emphasis supplied). Not only does this provision indicate that the concept of alimony was considered by the parties in their agreement, it reflects that traditional principles governing an award of alimony by a judge were, to some extent, modified or limited by the agreement.[16] See G. L. c. 208, § 34, as then in effect.[17] Continuing, paragraph 7.2 recites, inter alia, that the parties recognize that they may enter into an agreement prior to marriage concerning the disposition of their property in the event of divorce and that the agreement will be enforced unless, with respect to alimony, enforcement would cause one of the parties to become eligible under a program of public assistance at the time of the divorce. This provision indicates, as the judge stated, that the parties intended that alimony could be awarded from the parties'

---

[16] Indeed, the husband's position that the agreement should have been interpreted so as to permit either party to seek alimony from the other based on traditional principles of alimony, would appear inconsistent with the language of paragraph 7.1.

[17] The judge noted that in this case there had been a modification of rights under G. L. c. 208, § 34.

separate property (including income from such property) to prevent a party from becoming a public charge.[18]

While the premarital agreement, as the husband states and as the judge noted, does not contain a waiver of alimony per se, against the backdrop of the parties' intent to protect their separate property (including income streams), and the above discussed language of paragraph 7 as it pertains to awards of alimony, we think the judge reasonably and properly construed the agreement to limit the husband's claim for alimony in the manner we have previously described.  We also agree with the judge that the modification of rights under G. L. c. 208, § 34, does not, in the circumstances, act as an "unknowing waiver" of the husband's alimony rights.

b.  <u>Temporary alimony</u>.  The husband argues that the master/judge erred in ordering him to reimburse the wife for temporary alimony in the amount of $32,000 paid during the pendency of the divorce case.  In view of (at least) the wife's

---

[18] As to the husband's claim that there was "no evidence whatsoever from any source that the parties intended to waive their right to alimony from the separate property of the other," his assertion overlooks the language of the premarital agreement.  Moreover, even were we to assume that extrinsic evidence may be considered here, the wife's testimony is generally consistent with the judge's construction of the agreement.  Among other things, the wife stated that she understood that the parties were waiving "the rights the State of Massachusetts would provide us in terms of alimony, but that we were leaving open the option so that if somebody was -- somehow had lost all their money, then that would be a time -- that would be an example when there might be alimony."

failure to object to the payment of any temporary alimony on the grounds that payment was proscribed on the basis of the premarital agreement[19] and her "request" for the entry of an order for temporary alimony,[20] we do not think the present case is an appropriate one in which to invoke (as the master and the judge did) the doctrine of "unjust enrichment."  See generally Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005) ("[u]njust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience'").

5.  The wife's appeal.  The wife testified that between 2008 and 2010, she incurred numerous expenses which put a financial strain on her and resulted in her obtaining a loan

---

[19] We note that there is no specific reference in the premarital agreement to temporary alimony.  For a recent discussion of temporary alimony under G. L. c. 208, § 17, see Holmes v. Holmes, 467 Mass. 653 (2014).

[20] In her opposition to the husband's request for temporary alimony, the wife described what she viewed as her then straightened financial condition.  She "strenuously" opposed the husband's request for temporary alimony in the amount of $12,000 a month, and "request[ed]" the court to order a more suitable amount of $1,500 a month.  The wife attached to her opposition a proposed order consistent with her request.  The motion judge, who was not the trial judge, ordered an amount modestly in excess of the wife's request.

from her late husband's brother in the amount of $100,000.[21] She

sought to have the husband share equally the debt incurred.

The master found in his initial report that the wife

borrowed the sum in question in June, 2010, after the parties

had separated and without the knowledge or assent of the

husband. The master stated that the wife had other sources of

income and assets from which she could have obtained these funds

but she chose not to access these sources. Continuing, the

master found that the loan was for the convenience of the wife

in paying her various liabilities and living expenses at the

time, and that the debt owed should be the responsibility of the

wife.

In response to the wife's objections to the master's

initial report, the master supplemented in his amended report

his findings with respect to the loan. Among other things, he

noted that while the wife incurred great expenses as a result of

her voluntary willingness to provide financial help to the

husband's three adult daughters from his first marriage, she was

under no legal obligation to do so, and her generosity does not

---

[21] The expenses incurred by the wife resulted, in part, from the wife's defense of an unrelated civil lawsuit, the payment of college expenses for the parties' son (the parties had one child) and the payment of numerous voluntary expenses for the husband's adult children. The wife testified that she maintained a close relationship with the husband's children by his previous marriage.

provide a compelling basis to force the husband to repay a loan he did not agree to seek.[22]

The wife argues that the court erred in determining that the husband need not share in the payment of the debt. More particularly, she asserts that she was generally responsible for all the parties' living expenses and costs incurred (with little or no assistance from the husband) and that the loan was not simply for her "convenience," but to pay "legitimate familial obligations" (at least some of which benefitted the husband). As the loan, in the wife's view, was used for legitimate and proper purposes, she asserts that the premarital agreement, insofar as it provides that "marital estate property shall be divided equally between us," paragraph 7.3 (d), supra, encompasses marital debt, and required the judge to order that the husband share equally the $100,000 debt.

Putting to one side the fact that the parties' agreement contains no specific provision concerning the payment of marital liabilities, the master, and consequently the judge, determined, on all the evidence (including the timing, lack of assent on the

---

[22] The master also noted that some of the borrowed money was used to support the parties' unemancipated son. The master stated that this "constitutes a whole different basis for analysis" and was the reason why he entered a specified finding requiring the husband to contribute to the past support of the son. The master suggested that there would be "some degree of double dipping" if the husband were required to pay back a portion of the $100,000 debt and the reimbursement in the specified finding.

part of the husband, and the expenses which gave rise to the loan), that this particular liability should be treated as an individual debt of the wife.  In the circumstances of this case, we fail to discern either an abuse of discretion or an error of law.

6.  <u>Conclusion</u>.  So much of the supplemental judgment, as corrected, as orders the husband to reimburse the wife the sum of $32,000 for the temporary alimony paid by her is vacated.  In all other respects, the supplemental judgment, as well as the orders contained in the so-called bifurcated judgment, are affirmed.

The husband's request for sanctions for frivolous arguments is denied.

<u>So ordered</u>.